## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA HOLMES, *et al.*,

          Plaintiffs,

v.

FEDERAL ELECTION COMMISSION,

          Defendant.

Civ. No. 14-1243-RMC

OPPOSITION

## DEFENDANT FEDERAL ELECTION COMMISSION'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Lisa Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law
lstevenson@fec.gov

Kevin Deeley
Acting Associate General Counsel
kdeeley@fec.gov

Erin Chlopak (D.C. Bar No. 496370)
Acting Assistant General Counsel
echlopak@fec.gov

Steve N. Hajjar
Benjamin A. Streeter III
Attorneys
shajjar@fec.gov
bstreeter@fec.gov

Federal Election Commission
999 E Street, N.W.
Washington, DC 20463
(202) 694-1650

September 8, 2014

## TABLE OF CONTENTS

**Page**

BACKGROUND ...................................................................................................2

I.      THE PARTIES.............................................................................................2

II.     RELEVANT STATUTORY AND REGULATORY PROVISIONS ...........................3

      A.    Congress's Original Enactment of Per-Year Limits on
            Contributions to Candidates ..................................................................3

      B.    FECA'S Per-Election Limits on Contributions to Candidates.............................4

      C.    *Buckley v. Valeo*'s Affirmance of FECA's Contribution Limits .........................5

      D.    FECA's Current Per-Election Contribution Limit and
            Commission Implementing Regulations ................................................6

III.    PLAINTIFFS' COMPLAINT.........................................................................7

ARGUMENT ......................................................................................................9

I.      REQUIREMENTS FOR A PRELIMINARY INJUNCTION ......................................9

II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS .......................11

      A.    FECA's Per-Election Contribution Limits Do Not Violate
            The First Amendment ........................................................................11

            1.    Contribution Limits are Subject to Intermediate Scrutiny .......................11

            2.    As the Supreme Court Has Held, FECA's Individual
                 Contribution Limits Are Closely Drawn to Prevent Actual
                 and Apparent Corruption ...............................................................12

            3.    The Per-Election Structure of FECA's Individual Contribution
                 Limits Is Constitutional and Sensible.................................................15

            4.    The Amount of FECA's Per-Election Limits is Constitutional................19

B.  FECA's Per-Election Limit on Individual Contributions to Candidates
     Applies Equally to All Persons and Does Not Deny Plaintiffs
     Equal Protection of the Law ................................................................................. 22

     1.  Plaintiffs' Equal Protection Claim Fails Because the Per-Election
          Limit Does Not Create Any Classification ................................................ 22

     2.  Any Equal Protection Analysis of FECA's Individual Contribution
          Limits is Subject to Highly Deferential Review Under the
          Rational-Basis Standard .......................................................................... 24

     3.  FECA's Per-Election Limits Impose Evenhanded Contribution
          Restrictions On All Candidates and Contributors ................................... 27

     4.  None of the Cases Plaintiffs Cite Support Their Equal
          Protection Claim ...................................................................................... 28

III.  PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM ...................... 32

IV.  THE RELIEF PLAINTIFFS REQUEST WOULD HARM THE GOVERNMENT
       AND UNDERCUT THE PUBLIC INTEREST ......................................................... 35

CONCLUSION ..................................................................................................................... 37

# TABLE OF AUTHORITIES

**Page**

*Cases*

*Am. Meat Inst. v. Dep't of Agric.*, 968 F. Supp. 2d 38 (D.D.C. 2013)
  *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014) ...............................................33

*Arizona Free Enterprise Club Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011) ...29, 30

*Armour v. City of Indianapolis*, 132 S. Ct. 2073 (2012)......................................25

*Broussard v. Parish of Orleans*, 318 F.3d 644 (5th Cir. 2003) ................................23

*\*Buckley v. Valeo*, 424 U.S. 1 (1976) ..............1, 5, 6, 11, 12, 13, 14, 18, 19, 20, 22, 26, 27, 30

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)...........33, 34

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151 (1st Cir. 2004)..................34

*Christian Civil League of Me., Inc. v. FEC*, 433 F. Supp. 2d 81 (D.D.C. 2006)....................36

*Christian Knights of the Ku Klux Klan Invisible Empire, In. v. District of Columbia*,
  919 F.2d 148 (D.C. Cir. 1990) ...................................................33

*CityFed. Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)...........35, 36

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................33, 34

*Engquist v. Oregon Dept. of Agric.*, 553 U.S. 591 (2008).....................................22

*Dandridge v. Williams*, 397 U.S. 471 (1970) .............................................26

*Davis v. FEC*, 554 U.S. 724 (2008) ..............................................17-18, 20, 28-29, 30

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ..................................24-25, 26

*FEC v. Beaumont*, 539 U.S. 146 (2003) ...................................................11

*FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431 (2001) ..............................20

*FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480 (1985)..................................13

*Harris v. McRae*, 448 U.S. 297 (1980) ...............................................23-24

---

**\*Cases and Authorities chiefly relied upon are marked with an asterisk.**

*Heller v. Doe*, 509 U.S. 312 (1993) ................................................................25, 26

*Hicks v. Bush*, 397 F. Supp. 2d 36 (D.D.C. 2005) .......................................... 34-35

*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012)......................................................18

*Marks v. United States*, 430 U.S. 188 (1977) .......................................................11

*McConnell v. FEC*, 540 U.S. 94 (2003)..................................................................12

*McCoy v. Richards*, 771 F.2d 1108 (7th Cir. 1985)...............................................23

*McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) ...............................1, 11, 13, 14, 18, 20, 21, 22

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)......................... 9-10

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ........................25, 26

*Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253 (D.C. Cir. 1991) .............33, 34

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) .........................36

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) .....................................13, 20

*Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92 (1972).......................27

*Randall v. Sorrell*, 548 U.S. 230 (2006) .................................................17, 18, 20

*Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014) ............................29, 31, 32

*Rufer v. FEC*, No. 14-cv-837, 2014 WL 4076053 (D.D.C. Aug. 19, 2014)....................32, 35

*Sampson v. Murray*, 415 U.S. 61 (1974) ..............................................................32

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)...............................................10

*Smith v. Henderson*, 944 F. Supp. 2d 89 (D.D.C. 2013).........................................10

*Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44 (D.D. C. 2013).........33

*Tenacre Found v. INS*, 78 F.3d 693 (D.C. Cir. 1996)............................................34

*United States v. Jenkins*, 909 F. Supp. 2d 758 (E.D. Ky. 2012) .............................23

*United States v. Williams*, No. 02-4990, 2003 WL 21384640 (N.D. Ill. June 12, 2003) ........23

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)..................................................10

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973)................3, 5

*Vance v. Bradley*, 440 U.S. 93 (1979) .................................................................26

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252 (1977) ....................23

*Wagner v. FEC*, 717 F.3d 1007 (2013) .................................................................10

*Wagner v. FEC*, 854 F. Supp. 2d 83 (D.D.C. 2012) .................................................. 10, 26-27

*Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323 (1984) ....................................35

*\*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................9, 10, 32

*Wisc. Right to Life, Inc. v. FEC*, 542 U.S. 1305 (2004)................................................... 35-36

*Wis. Right to Life, Inc. v. FEC*, Civ. No. 04-1260, 2004 WL 3622736
    (D.D.C. Aug. 17, 2004)................................................................................34, 35

*Wis. Right to Life, Inc. v. FEC*, No. 04-1260, 2006 WL 2666017
    (D.D.C. Sept. 14, 2006) .................................................................................36

### Statutes and Regulations

Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 .................6, 29

Federal Election Campaign Act, 52 U.S.C. §§ 30101-30146 (2 U.S.C. §§ 431-57) .................2

52 U.S.C. § 30101(1) (2 U.S.C. § 431(1)).................................................................4, 15

52 U.S.C. § 30101(8)(A) (2 U.S.C. § 431(8)(A)).................................................................4

52 U.S.C. § 30106(b)(1) (2 U.S.C. § 437c(b)(1)).................................................................3

52 U.S.C. § 30107(a)(8) (2 U.S.C. § 437d(a)(8)) .................................................................3

52 U.S.C. § 30109 (2 U.S.C. § 437g) .................................................................3

52 U.S.C. § 30110 (2 U.S.C. § 437h) .................................................................10

52 U.S.C. § 30116(a)(1)(A) (2 U.S.C. § 441a).................................................................15

52 U.S.C. § 30116(a)(3) (BCRA § 307(b)) .................................................................6

52 U.S.C. § 30116(c)(1) (BCRA § 307(d)) .................................................................6

11 C.F.R. § 110.1(b)(2)(i).................................................................7

11 C.F.R. § 110.1(b)(2)(ii).................................................................7

11 C.F.R. § 110.1(b)(3)(i).................................................................7

11 C.F.R. § 110.1(b)(3)(i)(A)-(C) .............................................................................7

11 C.F.R. § 110.1(b)(3)(i)(C) ...................................................................................7

Fed. Election Campaign Act Amendments of 1974, Pub. L. No. 93-443 § 101(b)(3),
    88 Stat. 1263 ....................................................................................................4

Hatch Act, Pub. L. No. 76-753, 54 Stat. 767 (1940), 54 Stat. 770 ...........................3

### Miscellaneous

S. Rep. No. 101-165 (1939) .......................................................................................3

84 Cong. Rec. 9597 (1939) ........................................................................................3

86 Cong. Rec. 2720 (1940) (statement of Senator Bankhead) ..................................4

117 Cong. Rec. 43,410 (1971) ...................................................................................4

Aaron Blake, *Thad Cochran Faces Very Tough Odds in the Runoff. Here's Why*,
    Wash. Post (June 4, 2014), http://www.washingtonpost.com/blogs/the-
    fix/wp/2014/06/04/thad-cochran-faces-very-tough-odds-in-the-runoff-heres-why/ ...........17

Alexander Burns, *Thad Cochran, Chris McDaniel Barrel Toward Runoff*, Politico,
    http://www.politico.com/story/2014/06/primary-elections-2014-mississippi-
    california-new-jersey-iowa-107388.html..........................................................17

Editorial Reclassification Table,
    http://uscode.house.gov/editorialreclassification/t52/Reclassifications_Title_52.html.........2

FEC, *2014 Congressional Primary Election dates and Candidate Filing
    Deadlines for Ballot Access*, http://www.fec.gov/pubrec/fe2014/2014pdates.pdf ..............16

FEC, *Price Index Adjustments for Contribution and Expenditure Limits and
    Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013) ............6

No Party Preference Information, California Secretary of State,
    http://www.sos.ca.gov/elections/no-party-preference.htm ...............................7-8

Official 2014 Democratic Primary Results, Secretary of State –
    State of Mississippi, http://www.sos.ms.gov/Elections-Voting/Pages/Results-2014-
    Democratic-Primary.aspx .................................................................................16

Official 2014 Republican Primary Runoff Results, Secretary of State –
    State of Mississippi, http://www.sos.ms.gov/Elections-Voting/Pages/Results-
    2014-republican-Primary-Run-Off.aspx ...........................................................16

Washington Secretary of State, Elections & Voting, Top 2 Primary,
    https://wei.sos.wa.gov/agency/osos/en/voters/Pages/top_2_primary.aspx..........................16

The Federal Election Campaign Act ("FECA") currently permits individuals to contribute up to $2,600 per candidate, per election to as many federal candidates as they wish, in connection with as many elections as they choose.  In a typical election cycle with one primary and one general election, an individual seeking to maximize his contributions to a particular candidate may contribute $2,600 to that candidate for each of those elections for a combined total of $5,200.  In other circumstances, such as where a candidate must compete in a runoff election following a primary or general election, the combined total for that candidate is higher.

Nearly 40 years ago, the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), held that FECA's individual contribution limits — which at the time limited individual contributions to $1,000 per candidate, per election — were consistent with the First and Fifth Amendments to the Constitution.  The Court found that individual contribution limits serve the important government interests of limiting actual and apparent corruption resulting from large financial contributions to candidates, and do not unconstitutionally discriminate between incumbents and the candidates seeking to challenge them.  The *Buckley* Court also established a general rule, which it has since repeatedly reaffirmed, that it is not the role of courts to second-guess Congress's judgment regarding the appropriate dollar figure at which to set a contribution limit.

Earlier this year, in *McCutcheon v. FEC*, the Supreme Court struck down aggregate contribution limits Congress had enacted to prevent circumvention of FECA's per-election contribution limits, while emphasizing that the case did "not involve any challenge to th[os]e base limits, which [the Court] ha[s] previously upheld as serving the permissible objective of combating corruption."  134 S. Ct. 1434, 1442 (2014).

Plaintiffs are two individuals who wish to maximize their total election-cycle contributions to certain congressional candidates, while at the same time ensuring that their

contributions are not used in a way they would consider to be "wasted in an intraparty [primary election] squabble" (Pls' Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Pls' Mem.") at 1). Plaintiffs thus challenge the per-election structure of FECA's individual limits, arguing (*id.* at 9) that FECA's imposition of separate contribution limits for primary and general elections is "arbitrary."   Plaintiffs undermine their own argument:  but for their desire to prevent their contributions from being used for their preferred candidates' primary-election activities, plaintiffs could already have contributed the full $5,200 they wish to donate to those candidates.

More importantly, plaintiffs' request for a court-ordered modification of the structure and amount of FECA's longstanding per-election limits on individual contributions to candidates directly conflicts with well-settled, binding precedents and is thus unlikely to succeed.

Plaintiffs also have made no real effort to demonstrate any irreparable harm, and the relief they request would harm the public interest by upsetting the status quo in the final months before the general congressional elections.

Plaintiffs' motion for a preliminary injunction should be denied.

## BACKGROUND

## I.   THE PARTIES

The Federal Election Commission ("Commission" or "FEC") is the independent agency of the United States government with exclusive jurisdiction to administer, interpret, and civilly enforce the Federal Election Campaign Act ("FECA" or "Act"), 52 U.S.C. §§ 30101-30146 (formerly 2 U.S.C. §§ 431-57).[1]   The Commission is specifically empowered to "formulate

---

[1]     Effective September 1, 2014, the provisions of FECA that were codified in Title 2 of the United States Code were recodified in a new title, Title 52.  No text of any provision has been changed.  The Office of the Law Revision Counsel has prepared a table summarizing the changes made in the course of creating Title 52.  Editorial Reclassification Table, http://uscode.house.gov/editorialreclassification/t52/Reclassifications_Title_52.html.  To avoid

policy" with respect to the Act, 52 U.S.C. § 30106(b)(1) (2 U.S.C. § 437c(b)(1)); "to make,

amend, and repeal such rules . . . as are necessary to carry out the provisions of [the] Act," 52

U.S.C. § 30107(a)(8) (2 U.S.C. § 437d(a)(8)); and to civilly enforce the Act, 52 U.S.C. § 30109

(2 U.S.C. § 437g).

Plaintiffs are Laura Holmes and Paul Jost.  According to their complaint, Holmes and

Jost are United States citizens that are married to one another and reside in Miami, Florida.

(Compl. ¶ 8.)

## II.    RELEVANT STATUTORY AND REGULATORY PROVISIONS

### A.  Congress's Original Enactment of Per-Year Limits on Contributions to Candidates

Contribution limits have been one of the principal tools for preventing political

corruption in this country for nearly seventy-five years.  In the first half of the twentieth century,

Congress became particularly concerned about corruption arising from contributions to candidate

campaigns and political parties.  In 1939, Senator Carl Hatch introduced, and Congress passed,

S. 1871, officially titled "An Act to Prevent Pernicious Political Activities" and commonly

referred to as the Hatch Act.  S. Rep. No. 101-165, at *18 (1939); *U.S. Civil Serv. Comm'n v.*

*Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 560 (1973) ("*Letter Carriers*"); 84 Cong. Rec.

9597-9600 (1939).  Congress established individual contribution limits in the 1940 amendments

to the Hatch Act, Pub. L. No. 76-753, 54 Stat. 767 (1940).  That legislation prohibited "any

person, directly or indirectly" from making "contributions in an aggregate amount in excess of

$5,000, during any calendar year" to any candidate for federal office.  *Id.* § 13(a), 54 Stat. 770.

The limit was sponsored by Senator John H. Bankhead, who expressed his hope that it would

---

confusion concerning the recodification, this submission will use citations to the new provisions
of Title 52 with parentheses indicating the former Title 2 citations.

help "bring about clean politics and clean elections":  "We all know that large contributions to political campaigns . . . put the political party under obligation to the large contributors, who demand pay in the way of legislation . . . ." 86 Cong. Rec. 2720 (1940) (statement of Senator Bankhead).

### B.  FECA's Per-Election Limits on Contributions to Candidates

By 1971, when Congress began debating the initial enactment of FECA, the $5,000 individual contribution limit was being "routinely circumvented." 117 Cong. Rec. 43,410 (1971) (statement of Rep. Abzug).  In 1974, shortly after the Watergate scandal, Congress substantially revised FECA.  These amendments established new contribution limits on the amounts that individuals, political parties, and political committees could contribute to candidates, including a $1,000 per candidate, per-election limit on individual contributions to candidates and their authorized political committees.  Fed. Election Campaign Act Amendments of 1974, Pub. L. No. 93-443 § 101(b)(3), 88 Stat. 1263 (first codified at 18 U.S.C. § 608(b)(3)).

FECA's contribution limits apply both to direct contributions of money and to in-kind contributions of goods or services.  52 U.S.C. § 30101(8)(A) (2 U.S.C. § 431(8)(A)).  And the limits apply on a per-candidate, per-election basis, with "election" defined to include each of the following:

> (A) a general, special, primary, or runoff election; (B) a convention or caucus of a political party which has authority to nominate a candidate; (C) a primary election held for the selection of delegates to a national nominating convention of a political party; and (D) a primary election held for the expression of a preference for the nomination of individuals for election to the office of President.

52 U.S.C. § 30101(1) (2 U.S.C. § 431(1)).

4

**C.  *Buckley v. Valeo*'s Affirmance of FECA's Contribution Limits**

Shortly after the 1974 amendments to FECA were enacted, the statute was the subject of

a broad constitutional challenge in *Buckley v. Valeo*, 424 U.S. 1 (1976).  The Supreme Court

affirmed the constitutionality of FECA's individual contribution limits and held that the limits

were consistent with both the First and Fifth Amendments.  424 U.S. 1, 29, 35 (1976).

First, the Court found that the limits served the government's important anti-corruption

interests.  It explained:

> Under a system of private financing of elections, a candidate lacking immense
> personal or family wealth must depend on financial contributions from others to
> provide the resources necessary to conduct a successful campaign.  The increasing
> importance of the communications media and sophisticated mass-mailing and
> polling operations to effective campaigning make the raising of large sums of
> money an ever more essential ingredient of an effective candidacy. To the extent
> that large contributions are given to secure a political *quid pro quo* from current
> and potential office holders, the integrity of our system of representative
> democracy is undermined. Although the scope of such pernicious practices can
> never be reliably ascertained, the deeply disturbing examples surfacing after the
> 1972 election demonstrate that the problem is not an illusory one.

*Id.* at 26-27 (emphasis added).

The individual contribution limits were further justified, the *Buckley* Court held, by the

"almost equal[ly] concern[ing] . . . impact of the appearance of corruption stemming from public

awareness of the opportunities for abuse inherent in a regime of large individual financial

contributions."  *Id.* at 27.  The Court concluded that "Congress could legitimately conclude that

the avoidance of the appearance of improper influence 'is also critical . . . if confidence in the

system of representative Government is not to be eroded to a disastrous extent.'"  *Id.* at 27

(quoting *Letter Carriers*, 413 U.S. at 565).

The *Buckley* Court also rejected an equal protection challenged to FECA's individual

contribution limits.  The Court observed that FECA "applies the same limitations on

contributions to all candidates" and rejected arguments that the limits discriminate against major-party challengers to incumbents, explaining that "[c]hallengers can and often do defeat incumbents in federal elections." *Id.* at 31, 32. The Court explained that "the danger of corruption and the appearance of corruption apply with equal force to challengers and to incumbents" and accordingly found that "Congress had ample justification for imposing the same fundraising constraints upon both." *Id.* at 33.

In addition to its First and Fifth Amendment holdings, the *Buckley* Court found that FECA's then-$1,000 contribution was not unconstitutionally overbroad. *Id.* at 30. The Court rejected plaintiffs' argument that the limit was "unrealistically low" and held that courts should not second-guess Congress's decision regarding the exact dollar figure at which to set a contribution limit. *Buckley*, 424 U.S. at 30.

### D. FECA's Current Per-Election Contribution Limit and Commission Implementing Regulations

The Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 ("BCRA"), subsequently amended FECA to raise the individual limit and index it for inflation. *See* BCRA § 307(b), 116 Stat. 102-103 (codified at 52 U.S.C. § 30116(a)(3) (2 U.S.C. § 441a(a)(3)); BCRA § 307(d), 116 Stat. 103 (codified at 52 U.S.C. § 30116(c) (2 U.S.C. § 441a(c)(1)). The current limit, which applies to contributions made to federal candidates during the 2013-2014 election cycle, is $2,600 per candidate, per election. FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013). Because FECA defines "election" to include various types of electoral contests, the total amount that one may contribute to a particular candidate during a particular election cycle depends on how many elections that candidate must participate in to successfully pursue the federal office being sought.

Commission regulations explain the rules for determining to which election a particular candidate contribution is attributed. Contributors "are encouraged" to designate in writing the particular election for which an individual contribution is intended. 11 C.F.R. § 110.1(b)(2)(i). If a contributor does not make a written designation, his contribution is treated as if intended for "the next election for that Federal office after the contribution is made." *Id.* § 110.1(b)(2)(ii).

A contributor may designate his contribution in writing for a particular election even after that election has occurred, but in such cases the contribution must not exceed the candidate's net debts outstanding from the designated election. *Id.* § 110.1(b)(3)(i). In the event that a candidate's net outstanding debts amount to less than the amount of a contribution designated for a previous election, FEC regulations permit the candidate (or his committee) to refund, redesignate to a different election, or reattribute the contribution as from a different person. 11 C.F.R. § 110.1(b)(3)(i)(A)-(C). If a candidate fails to qualify for the general election, then all general-election contributions received by that candidate must similarly be returned, redesignated, or reattributed. 11 C.F.R. § 110.1(b)(3)(i)(C).

## III.   PLAINTIFFS' COMPLAINT

Plaintiffs wish to make contributions to the general election campaigns of two candidates for Congress in California and Iowa, respectively, in amounts that are double FECA's per-election limits. (Compl. ¶ 8, 18)

Plaintiff Holmes seeks to contribute to Carl DeMaio, a candidate seeking to represent California Congressional District 52. (*Id.* ¶ 19.) Under California's "Top Two" primary system, all candidates for United States congressional offices are listed on the same primary ballot and the two candidates that receive the most votes, regardless of party preference, proceed to compete in the general election. *See* No Party Preference Information, California Secretary of

State, http://www.sos.ca.gov/elections/no-party-preference.htm (last visited Sept. 6, 2014);

Compl. ¶ 19.  DeMaio received the second largest number of votes in California's June 3, 2014

congressional primary election and thus will proceed to compete in the general election.  (Compl.

¶ 19.)

Plaintiff Holmes chose not to make a primary election contribution to DeMaio but has

contributed $2,600 to his general election campaign.  (*Id.* ¶ 21; Pls' Mem. at 1.)  Plaintiff

Holmes wishes to contribute an additional $2,600 to DeMaio's general-election campaign, so

that her total contributions in support of DeMaio's general-election campaign would amount to

$5,200, twice the limit under 2 U.S.C. § 441a.

Plaintiff Jost seeks to contribute to Mariannette Miller-Meeks, a candidate seeking to

represent Iowa's Second Congressional District.  (Compl. ¶ 22.)  Miller-Meeks won Iowa's June

3, 2014 Republican primary election and thus will proceed to compete in the general election.

(*Id.*)

Plaintiff Jost chose not to make a primary-election contribution to Miller-Meeks but has

contributed $2,600 to her general-election campaign.  (*Id.* ¶ 24; Pls' Mem. at 1.)  Like plaintiff

Holmes, plaintiff Jost would like to contribute an additional $2,600 to Miller-Meeks's general-

election campaign, so that his total contributions in support of Miller-Meeks's general-election

campaign would amount to $5,200, twice the statutory limit.  (Compl. ¶ 24.)

According to the complaint, plaintiffs "do not wish to exceed the [total] base candidate

contribution limit over the combined primary and general election periods," but they would like

to contribute the maximum amounts permitted for primary and general-election campaigns

combined — $5,200 — "entirely for the general election."  (*Id.* ¶ 25-26.)  Plaintiffs allege that

FECA's distinctions between primary and general elections are "arbitrary."  (*Id.* ¶ 26.)  They ask

the Court to permit them to make their desired candidate contributions on an election-cycle basis, thereby allowing them to contribute to their preferred candidates' general-election campaigns in amounts that are double FECA's current per-election limits.  (*Id.*)

## ARGUMENT

Plaintiffs' request for a preliminary injunction must be denied.  As the Supreme Court has held, FECA's individual, per-election contribution limits are closely drawn to serve the important government interests of deterring actual and apparent corruption, while also treating all contributors and candidates equitably under the law.  Plaintiffs do not dispute that individual contribution limits are constitutional, but they nevertheless seek to restructure and increase the amount of FECA's existing limits to better suit their preferred manner of supporting certain candidates.  Plaintiffs' claims lack any legal support and their own conduct — timing their contributions to their preferred candidates to prevent such contributions from being "wasted on" those candidates' primary-election expenses — undermines their argument that the statute's distinction between primary and general elections is arbitrary.  Plaintiffs' claims are thus unlikely to succeed.  And plaintiffs' generalized legal assertions fail to demonstrate irreparable harm or to meet the other requirements for the extraordinary remedy they seek in this case.

## I.     REQUIREMENTS FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. . . . [It is] never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008) (citations omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20; *see also Mills*

*v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009).  A plaintiff must make a "clear showing" that the extraordinary remedy is necessary, and it cannot be "based only on a possibility of irreparable harm."  *Winter*, 555 U.S. at 22.  Moreover, the D.C. Circuit "has suggested, without deciding, that *Winter* should be read to abandon [any] sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm."  *Smith v. Henderson*, 944 F. Supp. 2d 89, 95-96 (D.D.C. 2013) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011));  *Wagner v. FEC*, 854 F. Supp. 2d 83, 87 (D.D.C. 2012) (same).

Plaintiffs here shoulder a particularly heavy burden because their request is at odds with the purpose of a preliminary injunction, which "is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Rather than seeking to preserve the status quo, plaintiffs seek to "upend" it by asking this Court, less than three months before the general congressional elections, to restructure statutory contribution limits that have been in place for nearly 40 years.  *See Sherley*, 644 F.3d at 398.[2]

---

[2]  The Commission notes that plaintiffs' complaint invokes this Court's jurisdiction under 2 U.S.C. § 437h (recently recodified at 52 U.S.C. § 30110), under which a district court makes findings of fact and screens the constitutional issues presented for substantiality and possible certification of questions to the *en banc* Court of Appeals.  52 U.S.C. § 30110 (2 U.S.C. § 437h); *Wagner v. FEC*, 717 F.3d 1007 (D.C. Cir. 2013) (per curiam).  The Court of Appeals in *Wagner* noted that "whether section 437h deprives the district court of authority to grant [preliminary injunctive] relief based on a constitutional challenge to FECA" remains an unresolved legal question.  717 F.3d at 1017 n.9.  Because this case does not warrant the extraordinary remedy of a preliminary injunction, *see infra* pp. 32-36, this Court need not resolve that question here either.

**II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS**

     **A.     FECA's Per-Election Contribution Limits Do Not Violate the First Amendment**

          *1.     Contribution Limits Are Subject to Intermediate Scrutiny*

Since *Buckley*, laws that restrict expenditures have been subject to strict scrutiny, while laws that restrict contributions have been reviewed under a more deferential standard.  *See* 424 U.S. at 23.  The Supreme Court applies this lesser standard of review because contributions "lie closer to the edges than to the core of political expression," *FEC v. Beaumont*, 539 U.S. 146, 161 (2003), in contrast to laws limiting campaign expenditures, which "impose significantly more severe restrictions on protected freedoms of political expression and association," *Buckley*, 424 U.S. at 23.  Unlike a "limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication."  *Id*. at 20.  "[C]ontribution limits 'permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the contributor's freedom to discuss candidates and issues."  *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 21, alterations in *McCutcheon*).[3]

A contribution limit thus need not pass the strict scrutiny test of being upheld only if it "promotes a compelling interest and is the least restrictive means to further the articulated interest."  *McCutcheon*, 134 S. Ct. at 1444.  Instead, "[e]ven a significant interference with protected rights of political association may be sustained if the [government] demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary

---

[3]     The plurality opinion authored by Chief Justice Roberts is "the holding of the Court" because it rests on narrower grounds than Justice Thomas's opinion concurring in the judgment. *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation and internal quotation marks omitted).

abridgment of associational freedoms." *Id.* (internal quotation marks and citation omitted).

> ### 2. As the Supreme Court Has Held, FECA's Individual Contribution Limits Are Closely Drawn to Prevent Actual and Apparent Corruption

Contrary to plaintiffs' characterization (Pls' Mem. at 1), their claims are in no way "novel." The Supreme Court in *Buckley* applied intermediate scrutiny and upheld the then-$1,000 contribution limit that is the subject of this lawsuit. 424 U.S. at 23-28; *see id.* at 29 ("We find that, under the rigorous standard of review established by our prior decisions, the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling.")

The Court held that the limits further the important governmental interests of preventing "the actuality and appearance of corruption resulting from large individual financial contributions." *Id.* at 26; *see also McConnell v. FEC,* 540 U.S. 93, 298 (2003) (Kennedy, J. concurring in the judgment in part and dissenting in part) (observing that *Buckley* recognized Congress's "interest in regulating the appearance of corruption that is 'inherent in a regime of large individual financial contributions'") (quoting *Buckley*, 424 U.S. at 27). Specifically, the Court indentified two "weighty interests . . . sufficient to justify" the then-$1000 limit on individual contributions to candidates. *Buckley*, 424 U.S. at 29. First, the limit reduces the opportunity to use large contributions "to secure a political quid pro quo from current and potential office holders." *Id.* at 26. While acknowledging that "the scope of such pernicious practices can never be reliably ascertained," the Court observed that "the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one." *Id.* at 27. The Court also recognized that "the integrity of our system of representative democracy is undermined" by such corrupt arrangements. *Id.* at 26-27.

Second, and "[o]f almost equal concern," the limit reduced "the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Buckley*, 424 U.S. at 27.  The Court acknowledged that most large contributors do not seek improper influence, and that it is "difficult to isolate suspect contributions," but nevertheless concluded that "the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated."  *Id.* at 30; *see also FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 500 (1985) (noting the Court's "deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized").  "Congress," the Court reasoned, "could legitimately conclude that the avoidance of the appearance of improper influence is . . . critical, if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Buckley*, 424 U.S. at 27 (internal quotation marks, ellipsis, and citation omitted).

The Court has reiterated these conclusions more recently in addressing the constitutionality of other contribution restrictions.  *See*, *e.g.*, *McCutcheon*, 134 S. Ct. at 1451 (invalidating FECA's aggregate limits on contributions to candidates while emphasizing that the statute's individual, per-election limits on candidate contributions remain "undisturbed" and that those limits are "the primary means of regulating campaign contributions"); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 397-398 (2000) (upholding Missouri's individual contribution limits, ranging from $250 to $1,000, and noting that "[t]here is no reason in logic or evidence to doubt the sufficiency of *Buckley* to govern this case in support of the Missouri statute").

Plaintiffs wrongly suggest (Pls' Mem. at 18) that the Court's constitutional analysis of contribution limits has been limited to considering the rights of candidates, not contributors.  On

the contrary, the effects of the limits on contributors' First Amendment rights have been fundamental to the Court's analysis and conclusions.  The Court in *Buckley* began its evaluation of FECA's individual contribution limits by recognizing that "the primary First Amendment problem raised by the Act's contribution limitations is their restriction of one aspect of the *contributor's* freedom of political association."  424 U.S. at 24 (emphasis added).  The Court determined that FECA's per-election limit focuses "precisely on . . . the narrow aspect of political association where the actuality and potential for corruption have been identified while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources."  *Id.* at 28-29.  And the Court concluded that "the Act's contribution limitations in themselves do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues" by, among others, "individual citizens."  *Id.* at 29.  In other words, the Court found the limits constitutional precisely because they are closely drawn to further the government's important anticorruption interests while avoiding unnecessary abridgment of *contributors'* associational freedoms.

The Court in *McCutcheon* likewise addressed the rights of contributors:  "[C]ontribution limits 'permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the *contributor's* freedom to discuss candidates and issues.'"  134 S. Ct. at 1444 (emphasis added; quoting *Buckley*, 424 U.S. at 21, alterations in *McCutcheon*).  The Supreme Court has thus clearly and explicitly considered the effect of contribution limits on the First Amendment rights of contributors in upholding such limits as constitutional.

14

### 3. The Per-Election Structure of FECA's Individual Contribution Limits Is Constitutional and Sensible

One of the ways that FECA properly balances the First Amendment rights of contributors and candidates with the government's important anticorruption interests is by accounting for different electoral procedures between states and even within a particular state depending on the office being contested or the circumstances characterizing a particular race. Congress clearly recognized that being elected to a federal office may be the result of multiple, separate elections. The statute thus defines "election" to include several types of electoral contests, including, *inter alia*, "a general, special, primary, or runoff election." 52 U.S.C. § 30101(1) (2 U.S.C. § 431(1)). And by providing that "*no person* shall make contributions . . . to *any* candidate . . . with respect to *any* election for Federal office" that exceeds a total amount of $2,600, it imposes the same $2,600 per-election limit on *all* contributors and candidates, while allowing individuals to make contributions up to that amount for any federal election. 52 U.S.C. § 30116(a)(1)(A), 2 U.S.C. § 441a (emphasis added). The limit thus applies equally and evenly to all contributors and all candidates for every election in which they must participate, including, but not limited to, primary and general elections.

The limit's per-election structure not only is closely drawn to further the government's important anticorruption interests, it is an eminently reasonable means of serving that interest. The per-election structure accounts for the lack of uniformity in federal electoral contests — including the races in different political parties for the same particular office — and ties the amount of money that a particular candidate can receive (and that the candidate's supporters may contribute) to the number of elections in which that candidate participates.[4] Thus, a candidate

---

[4]    The lack of such uniformity is evident, for example, in the fact that nine states currently provide for primary runoff elections in federal electoral contests under varying circumstances.

who must compete in both a primary and runoff election in order to proceed to a general election can receive a different number of contributions from a given contributor during an election cycle than any general-election opponents who were not required to compete in runoff contests.

This very scenario played out during the current election cycle in Mississippi, and the candidate who had to compete in a runoff in order to proceed to the general election was six-term incumbent Mississippi Senator Thad Cochran.  Despite his incumbent status, Senator Cochran failed to receive enough votes in the Mississippi Republican Senate primary election to avoid a runoff election against his primary opponent, Chris McDaniel.  *See* Official 2014 Republican Primary Runoff Results, Secretary of State – State of Mississippi, http://www.sos.ms.gov/Elections-Voting/Pages/Results-2014-republican-Primary-Run-Off.aspx (last visited Sept. 6, 2014).  In contrast, the Democratic challenger, Travis Childers, won the Democratic primary by a sweeping margin and therefore avoided having to participate in a runoff.  *See* Official 2014 Democratic Primary Election Results, Secretary of State – State of Mississippi, http://www.sos.ms.gov/Elections-Voting/Pages/Results-2014-Democratic-Primary.aspx (last visited Sept. 6, 2014).  Uniform per-election-cycle limits such as those plaintiffs propose would have meant Senator Cochran and challenger Childers would have been

---

*See* Federal Election Commission, 2014 Congressional Primary Election Dates and Candidate Filing Deadlines for Ballot Access, at 1-2, http://www.fec.gov/pubrec/fe2014/2014pdates.pdf (last visited Sept. 6, 2014).  Moreover, in Louisiana, no congressional primary election is held; the first election for candidates seeking federal office is the general election scheduled for November 4, 2014, though, if necessary, the state will hold a runoff election on December 6, 2014.  *Id.* at 2 n.8.  And in California — that state in which plaintiff Jost's preferred candidate seeks election — as well as in Washington, a candidate that lacks an intraparty primary challenger could still fail to proceed to the general election because all candidates for a particular office are listed on the same primary ballot and the two candidates that receive the most votes, *regardless of party preference*, proceed to compete in the general election.  *See* supra p. 7 (describing California's top-two primary system); Washington Secretary of State, Elections & Voting, Top 2 Primary, https://wei.sos.wa.gov/agency/osos/en/voters/Pages/top_2_primary.aspx (last visited Sept. 6, 2014).

permitted to receive the same amounts from contributors over the course of the election cycle. A

per-election-cycle limit would make less sense than a per-election limit given that Senator

Cochran had to compete in an additional, hotly contested runoff race in order to proceed to the

general election. *See*, *e.g.*, Alexander Burns, *Thad Cochran, Chris McDaniel Barrel Toward*

*Runoff*, Politico (last updated June 4, 2014, 4:57 PM),

http://www.politico.com/story/2014/06/primary-elections-2014-mississippi-california-new-

jersey-iowa-107388.html (citing the "costly runoff election" that incumbent Senator Cochran

faced after failing to receive enough votes to win the Mississippi Republican Senate primary)

(last visited Sept. 6, 2014); Aaron Blake, *Thad Cochran Faces Very Tough Odds in the Runoff.*

*Here's Why*, Wash. Post (June 4, 2014), http://www.washingtonpost.com/blogs/the-

fix/wp/2014/06/04/thad-cochran-faces-very-tough-odds-in-the-runoff-heres-why/ (analyzing

incumbent primary data from the past 14 years and observing that primary runoffs "are very

unkind to incumbents") (last visited Sept. 6, 2014).

   Mississippi's example demonstrates clearly why FECA's per-election limits operate more

equitably than the per-election-cycle limits plaintiffs would prefer. Indeed, plaintiffs' proposed

election-cycle structure could create the very disadvantages and inequities about which plaintiffs

purport to be concerned. The Supreme Court has in fact indicated that a per-cycle limit on

contributions to candidates is a "danger sign[]" of potential unconstitutionality as compared to

limits that are set per-election, precisely the *opposite* of plaintiffs' contentions here. *See Randall*

*v. Sorrell*, 548 U.S. 230, 249 (2006) (Breyer, J., plurality op.) (expressing concerns about a state

election-cycle-based contribution limit); *see also id.* at 268 (Thomas, J., concurring) (discussing

inequities created by election-cycle-based contribution limits and describing election-cycle

structure as "constitutionally problematic"); *Davis v. FEC,* 554 U.S. 724, 738 (2008) (stating that

17

the Court has "never upheld the constitutionality of a law that imposes different contribution

limits for candidates who are competing against each other"); *Lair v. Bullock*, 697 F.3d 1200,

1208 (9th Cir. 2012) (citing Justice Breyer's concern in *Randall* about "limits [that] are set per

election cycle, rather than divided between primary and general elections" and concluding that

*Randall* did not require the district court to invalidate Montana's contribution limit because, *inter*

*alia*,  the Montana limits, unlike the Vermont limits challenged in *Randall*, "apply to 'each

election in a campaign'").

        In addition to these fairness considerations, setting contribution limits on a per-election

basis minimizes the extent to which the limits restrict contributors' freedom of political

association.  *See Buckley*, 424 U.S. at 24-25.  FECA's contribution limits do not, as plaintiffs

contend (Pls' Mem. at 6), "allow[] certain political contributors to associate for a longer period

of time and to a greater extent than others."  Individuals may *choose*, as plaintiffs have done here

(Pls' Mem. at 1), not to associate with a candidate in connection with every election in which

that candidate participates during a given election cycle, but FECA allows contributors to do so

if they choose otherwise.[5]

        Plaintiffs are thus clearly wrong when they claim (*e.g.*, Pls' Mem. at 6, 9, 10, 17, 20) that

the per-election structure of FECA's individual contribution limits is "asymmetrical,"

"arbitrary," or "artificially bifurcated."  (*See*, *e.g.*, Pls' Mem. at 1, 9-10, 13, 25.)  As plaintiffs'

_____

[5]        Even if plaintiffs' anecdotal allegations actually supported their claims that FECA, as
opposed to plaintiffs' own voluntary conduct, has restricted their freedom to associate fully with
their preferred candidates — and they do not — such allegations do not demonstrate that the per-
election contribution limits fail under intermediate scrutiny.  *See McCutcheon*, 134 S. Ct. at 1444
(explaining that contribution limits need not pass the strict scrutiny test of using "the least
restrictive means" to "promote a compelling interest," and that "[e]ven a significant interference
with protected rights of political association may be sustained if the [government] demonstrates a
sufficiently important interest and employs means closely drawn to avoid unnecessary
abridgment of associational freedoms") (internal quotation marks and citation omitted).

explicit desire (Pls' Mem. at 1) not to allow their contributions to be "wasted" on primary-election expenses illustrates, there is nothing arbitrary or artificial about FECA's treatment of primary and general elections (and other intra-cycle elections) as separate contests.  And as explained above, FECA's per-election structure is far more symmetrical and equitable than the per-election-cycle structure plaintiffs propose.

4.     *The Amount of FECA's Per-Election Limits Is Constitutional*

Plaintiffs state (Pls' Mem. at 10) that they "do not contest" the amount of FECA's individual contribution limits.  They do, however, claim a constitutional right to make general-election contributions to certain federal candidates in amounts that are double the per-election limit.  (*See id.* at 4 (explaining that plaintiffs seek to make contributions of up to $5,200 to certain candidates exclusively for those candidates' general-election campaigns).)  To the extent that claim effectively challenges the constitutionality of the amount of FECA's current per-candidate, per-election contribution limit, it too is foreclosed by *Buckley* and its progeny.  The *Buckley* Court held that FECA's then-$1,000 limit was not unconstitutionally overbroad and rejected the plaintiffs' argument that the limit was "unrealistically low because much more than that amount would still not be enough to enable an unscrupulous contributor to exercise improper influence over a candidate or officeholder, especially in campaigns for statewide or national office."  424 U.S. at 30.  The Court explained that even if Congress could have done more "fine tuning" in setting the amount of the limit, its failure to do so did not render the limit unconstitutional.  *Id.*  Courts lack a "scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000.  Such distinctions in degree become significant only when they can be said to amount to differences in kind."  *Id.* (internal quotation marks and citation omitted).

The Court has repeatedly reaffirmed *Buckley's* general rule that courts do not second-guess Congress's decision regarding the exact dollar figure at which to set a contribution limit. *See Randall*, 548 U.S. at 248 (Breyer, J., plurality op.) ("In practice, the legislature is better equipped to make such empirical judgments, as legislators have particular expertise in matters related to the costs and nature of running for office. Thus ordinarily we have deferred to the legislature's determination of such matters.") (internal quotation marks and citation omitted); *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 446 (2001) ("[T]he dollar amount of the limit need not be 'fine tun[ed]' . . . .") (quoting *Shrink Missouri*, 528 U.S. at 387-88, alterations in original); *cf. Davis v. FEC*, 554 U.S. 724, 737 (2008) ("When contribution limits are challenged as too restrictive, we have extended a measure of deference to the judgment of the legislative body that enacted the law.") (citing *Randall*, *Shrink Missouri*, and *Buckley*).  In the lone instance where the Court invalidated an individual, base contribution limit, the Court did so largely because the state contribution limits in question were so low it appeared they would "significantly restrict the amount of funding available for challengers to run competitive campaigns."  *See Randall*, 548 U.S. at 253.  Plaintiffs make no such showing and their desire not to "waste" their contributions on their preferred candidates' primary contests (Pls' Mem. at 1) does not demonstrate any constitutional dilemma with the amount of FECA's per-election limits.

Nor are plaintiffs correct when they claim (*e.g.,* Pls' Mem. at 13-14) that the Supreme Court decision in *McCutcheon* establishes a constitutional right to make contributions of up to $5,200 to a single candidate for a single election.  The Court struck down FECA's *aggregate* limits on the total amounts that individuals can contribute to all candidates or committees within a particular time period, while explicitly "leav[ing] . . . undisturbed" the per-election limit on individual contributions to a particular candidate for a particular election that is the subject of

this lawsuit and emphasizing that such "base limits remain the primary means of regulating campaign contributions." 134 S. Ct. at 1451. Following *McCutcheon*, individuals and others may now contribute up to the limit to as many federal candidates as they wish, and in connection with as many elections as those candidates participate in. To the extent *McCutcheon* is relevant at all here, however, it supports the Commission's position, not plaintiffs'.

*McCutcheon* expressly recognizes, and nowhere questions, the per-election structure of FECA's individual "base" limits. *See id.* at 1442 ("For the 2013-2014 election cycle, the base limits in the Federal Election Campaign Act . . . permit an individual to contribute up to $2600 *per election* to a candidate (*$5200 total for the primary and general elections*).") (emphases added); *id.* at 1448 (explaining that FECA's aggregate limits prevented "an individual from fully contributing to the *primary and general election campaigns* of ten or more candidates") (emphasis added). Having made clear that the "total" limit on contributions to a candidate's primary *and* general election campaigns is $5,200, the Court then proceeded throughout its opinion to refer collectively to FECA's combined limits on contributions to a candidate's primary and general election campaigns together as the Act's "base" limits. That shorthand made sense in the context of *McCutcheon*, because the decision was concerned with the constitutionality of the *aggregate* amount individuals could contribute to all candidates in connection with all elections during a particular two-year period. But nothing in the opinion states or even suggests that Congress or the Court has approved of the $5,200 contributions to a single candidate in connection with a single election that plaintiffs here wish to make.

On the contrary, in making clear that *McCutcheon* did "not involve any challenge to the base limits" at issue here, the Court stated that it "ha[d] previously upheld [such limits] as serving the permissible objective of combatting corruption." *Id.* at 1442. The Court made a

similar point in responding to criticism from the dissenting justices, emphasizing that the individual, per-election limits remain "undisturbed" and that those "base" limits "remain the primary means of regulating campaign contributions." *Id.* at 1451.

In sum, plaintiffs lack any legal support for their claimed right to make general-election contributions to their preferred candidates in amounts up to double the statutory limit.

**B.      FECA's Per-Election Limit on Individual Contributions to Candidates Applies Equally to All Persons and Does Not Deny Plaintiffs Equal Protection of the Law**

*1.       Plaintiffs' Equal Protection Claim Fails Because the Per-Election Limit Does Not Create Any Classification*

As a preliminary matter, the "core concern" of the Constitution's equal protection guarantee is "shield[ing] against arbitrary [government] classifications." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 598, 602 (2008) (describing scope of Fourteenth Amendment equal protection guarantee); *see Buckley*, 424 U.S. at 93 ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."). By contrast, statutory provisions that do not create any classifications whatsoever do not implicate equal protection concerns.

As explained above, *supra* p. 15, the Act's per-election limit on contributions by individuals to candidates applies explicitly to all "persons." It does not treat any group of persons differently from other persons. It does not classify anyone. It limits all individuals to the same $2,600 per-election limit. Indeed, the Supreme Court in *Buckley* recognized as much when it rejected the petitioners' similar argument that the Act's contribution limits invidiously discriminated between incumbents and challengers. 424 U.S. at 30-31. The Court disagreed, explaining "at the outset" that "the Act applies the same limitations on contributions to all candidates . . . . Absent record evidence of invidious discrimination against challengers as a

class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions." *Id.* at 31.

Where, as here, the challenged provision at issue contains no classification, courts have rejected plaintiffs' equal protection claims on that basis alone. *See*, *e.g.*, *Broussard v. Parish of Orleans*, 318 F.3d 644, 653-54 (5th Cir. 2003) (explaining that equal protection claims of arrestees were "doom[ed]" because challenged bail fee provisions that applied to all arrestees "fail to classify"); *McCoy v. Richards*, 771 F.2d 1108, 1112 (7th Cir. 1985) (equal protection claim fails because the statute "contains no classification scheme"); *United States v. Jenkins*, 909 F. Supp. 2d 758, 775 (E.D. Ky. 2012) (explaining that equal protection scrutiny was unnecessary for challenged provision of Hate Crimes Prevention Act, which extends protections to "*any person* who is the victim of bodily injury on the basis of his or her sexual orientation," "because the law creates no classifications among citizens, but is neutral on its face"); *United States v. Williams,* No. 02-4990, 2003 WL 21384640, at *4 (N.D. Ill. June 12, 2003) (explaining that equal protection scrutiny is "not appropriate when the challenged law creates no classifications").

The plaintiffs have not argued, and cannot plausibly contend, that a contribution limitation that applies equally to all persons is infirm under the equal protection component of the Fifth Amendment unless they can demonstrate that it was enacted specifically to further a discriminatory purpose. It is not enough to baldy allege, as plaintiffs do here (Pls'. Mem. at 17), "asymmetrical and discriminatory outcomes." *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) (requiring evidence of "discriminatory intent or purpose . . . to show a violation of the Equal Protection Clause"). "The equal protection component of the Fifth Amendment prohibits only purposeful discrimination, and when a facially neutral federal

statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove Congress selected or reaffirmed a particular course of action at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group." *Harris v. McRae*, 448 U.S. 297, 323 n.26 (1980) (internal quotations marks and citation omitted; emphasis added). Here, plaintiffs have not even attempted to demonstrate that Congress chose the per-election limit due to a discriminatory purpose, and their Fifth Amendment claim fails for that reason alone.

> 2. *Any Equal Protection Analysis of FECA's Individual Contribution Limits is Subject to Highly Deferential Review Under the Rational-Basis Standard*

Even if the Act's per-election contribution limit could be deemed to create some sort of de facto "class" of contributors — *e.g.* contributors to candidates running against incumbents where the incumbents did not face "significant" opposition in their primary elections (Pls' Mem. at 4) — such a classification would only merit the most deferential standard of rational-basis review.[6]  Under either the Equal Protection Clause of the Fourteenth Amendment or the Due Process Clause of the Fifth Amendment, "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal

---

[6]       Although this appears to be the de facto category of contributors plaintiffs attempt to identify (*see* Pls' Mem. at 4), it is far from clear that both plaintiffs even fall within such a category.  Plaintiffs misleadingly assert (*id.*) that "[b]oth of their preferred candidates face [general election] opponents who did not have a significant challenger during their respective primary elections."  But that is not quite accurate for Carl DeMaio, the candidate plaintiff Holmes supports.  DeMaio is seeking election to represent California's 52nd Congressional District.  (*Id.*; Compl. ¶ 20-21.)  As described *supra* at p. 7 and p. 14-15 note 4, in California, the lack of any *intraparty* primary challenger does not mean a candidate lacks a "significant" challenger during his primary election because all candidates for a particular office are listed on the same primary ballot and the two candidates that receive the most votes, *regardless of party preference*, proceed to compete in the general election.  Plaintiffs themselves recognize (Pls' Mem. at 26 n.6) that "[f]our candidates sought to advance to the general election for the 52nd Congressional district."  Under California's system, the absence of an intraparty challenger did not prevent DeMaio's general-election opponent from having to compete against the three other candidates opposing him in the primary.

protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-15 (1993); *see also*, *e.g.*, *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012) ("This Court has long held that a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.") (quotation marks omitted); *Heller v. Doe*, 509 U.S. 312, 320 (1993) (same); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461 (1981) (same).

The de facto "class" of contributors that plaintiffs describe is vague and would be difficult for the government to regulate. It is not clear what plaintiffs consider "significant" opposition, *see supra* note 6, nor do plaintiffs indicate how or when it is to be determined whether a candidate faces such "significant" opposition. It appears that whether a contributor falls within such a classification may depend on the contributor's own preferences and decisions and the specific circumstances of a particular electoral contest, factors over which the government has no control. But even setting these issues aside, it is clear that this vague category of contributors is neither a suspect nor a quasi-suspect classification that merits anything beyond rational-basis review.

Moreover, plaintiffs define their claim narrowly and seek only to structure certain candidate contributions in a manner that allows them to limit the scope of their association with their preferred candidates, while doubling their per-election contributions to such candidates for a single election. No case has recognized a "fundamental right" to *structure* candidate contributions in whatever manner a contributor desires and the Supreme Court has made clear that there is no fundamental right to make contributions in whatever *amount* a contributor

25

desires.  *E.g.*, *Buckley*, 424 U.S. at 23-29; *see supra* pp. 19-22.  Thus, plaintiffs have not alleged

any infringement of a "fundamental right" that warrants heightened constitutional review.

Under the highly deferential rational-basis standard, a court is not to judge the "wisdom,

fairness, or logic of legislative choices."  *Beach Commc'ns*, 508 U.S. at 313.  Instead, "those

challenging the legislative judgment must convince the court that the legislative facts on which

the classification is apparently based could not reasonably be conceived to be true by the

governmental decisionmaker."  *Clover Leaf Creamery*, 449 U.S. at 464 (quoting *Vance v.

Bradley*, 440 U.S. 93, 111 (1979)).  Plaintiffs attacking a provision under rational-basis review

have the burden "to negative every conceivable basis which might support it."  *Beach

Commc'ns*, 508 U.S. at 315 (citation and quotation marks omitted); *see also Heller*, 509 U.S. at

321 ("[C]ourts are compelled under rational-basis review to accept a legislature's generalizations

even when there is an imperfect fit between means and ends.  A classification does not fail

rational-basis review because it 'is not made with mathematical nicety or because in practice it

results in some inequality.'") (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970))).

In *Wagner v. FEC*, another court in this District concluded that an equal protection

challenge to FECA's provision banning federal contractors from making any contributions to

federal candidates was subject to the same intermediate scrutiny that governs the review of

contribution restrictions in the First Amendment context.  854 F. Supp. 2d at 97.  *Wagner* is not

controlling here, however, and the claims in that case are completely distinguishable from

plaintiffs' claims in this case.  In determining to apply intermediate scrutiny to the *Wagner*

plaintiffs' equal protection claims, the district court observed that "[t]o the extent that individual

federal contractors are treated differently from similarly situated persons or entities, the Court

must determine, '[a]s in all equal protection cases,' whether 'an appropriate governmental

interest [is] suitably furthered by the differential treatment.'" *Id.* (quoting *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  Here, however, the provisions in question apply to plaintiffs and the candidates they support *in exactly the same manner* as they apply to other contributors and candidates; it is plaintiffs that seek to receive different treatment.  Equally distinguishable is the *Wagner* plaintiffs' contention that FECA's prohibition on any candidate contributions by government contractors improperly burdened their fundamental right to associate.  *Id.*  Here, plaintiffs had the right to associate with their preferred candidates up to the full $5,200 amount that they seek to contribute to them, and for the full duration of the election cycle.  They simply elected, *voluntarily*, to forego exercising that right as a means of controlling when candidates spent such funds.  (Pls' Mem. at 1.)

In any event, whether the Court applies rational-basis review or intermediate scrutiny, the per-election contribution limits survive constitutional scrutiny, because the limits are closely drawn to further the government's important anticorruption interests, *see supra* pp. 12-14, and do not deny plaintiffs equal protection of the law.

> 3.    *FECA's Per-Election Limits Impose Evenhanded Contribution Restrictions On All Candidates and Contributors*

As indicated above, the Supreme Court in *Buckley* rejected a similar Fifth Amendment claim that the individual contribution limits at issue here unconstitutionally discriminate against challengers to incumbents.  The *Buckley* Court stressed as "important . . . [the fact] that the Act applies the same limitations on contributions to all candidates regardless of their present occupations, ideological views, or party affiliations."  424 U.S. at 31.  And it cautioned that "[a]bsent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions."  *Id.*

Plaintiffs have failed to present any such evidence of discrimination, whether against general-election challengers to incumbent candidates that did not face "significant" primary opposition or individuals seeking to make contributions to support the candidacies of such challengers.  At best, plaintiffs attempt to cast as legal rights and restrictions the alleged voluntary *tendencies* of some non-incumbent candidates to declare their candidacies (and thus begin accepting contributions) at some point after the incumbents they challenge have begun soliciting contributions for their reelection campaigns.  (Compl. ¶ 67.)  Even if it is true that such tendencies enable some contributors to some candidates to engage in one form of association with those candidates over a longer period of time than contributors to other candidates, that does not demonstrate that FECA denies anyone equal protection of the law.  FECA does not preclude candidates challenging incumbents from declaring their candidacies sooner.  More importantly, FECA's contribution limits did not restrict plaintiffs to "giv[ing] only half the money as many contributors who have already supported the opposing party candidate."  (*Id.* ¶ 67.)  Plaintiffs admit that they made that choice voluntarily, to ensure that their preferred candidates could use their contributions only "to fight the incumbent[s] rather than" on spending which would in their view be "wasted in an intraparty squabble."  (Pls' Mem. at 1.)  In addition to demonstrating the absence of any valid Fifth Amendment claim, plaintiffs' candid admission that they intentionally chose to contribute in a manner that would limit how their contributions were used — *i.e.* to ensure that the candidates did not "waste" their contributions on primary election expenses — highlights the limited extent of the associational interests at stake in plaintiffs' claims here.

4.      *None of the Cases Plaintiffs Cite Support Their Equal Protection Claim*

Plaintiffs argument that the $2,600 per-election contribution limit violates their Fifth Amendment rights fares no better upon examination of the cases they cite.  *Davis v. FEC*,

*Arizona Free Enterprise Club PAC v. Bennett*, and *Riddle v. Hickenlooper* are all inapposite because none of those cases concerned restrictions that apply evenly and across the board to all persons.  Those cases are thus clearly distinguishable, involving statutes that create separate contributions limits for persons similarly situated or which burden the free speech of privately funded candidates for the purpose of leveling the financial playing field.  None of those concerns are implicated here.

In *Davis v. FEC*, 554 U.S. 724 (2008), the Court considered a provision of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), 116 Stat. 109, known as the "Millionaires' Amendment."  In addition to a First Amendment claim, Davis, a 2006 congressional candidate, claimed that the Millionaires' Amendment violated his right to equal protection guaranteed by the Fifth Amendment.  Under the Millionaires' Amendment, congressional candidates that spent more than $350,000 of their own personal funds rendered their opponents eligible to receive contributions from individuals at up to three times the usual limit, which, for the 2006 election, was set at $2,100 per election.

The Court characterized the Millionaires' Amendment as an expenditure limitation and held that it violated the First Amendment by "impos[ing] an unprecedented penalty on any candidate who robustly exercises that First Amendment right [by spending personal funds].  [The Millionaires' Amendment] requires a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations." 554 U.S. at 739.  The Court further explained that even if the Millionaires' Amendment were considered a contribution limit, it would likely be found an unconstitutional asymmetrical contribution scheme whose principal rationale — leveling electoral opportunities — could not justify the infringement of First Amendment interests.  *Id.* at 740 n.7.

The per-election limit at issue in this case is nothing like the Millionaires' Amendment and does not suffer from the latter's constitutional infirmities.  As previously explained, *see supra* at 15, it is not asymmetrical, does not burden any candidate's right to expend personal funds, and unlike the Millionaires' Amendment, is justified as a means to prevent corruption or its appearance, as the Court held in *Buckley*.  In addition, although the Court declined to address Davis's equal protection claim in light of its First Amendment analysis, *id.* at 744 n.9, *Davis* is clearly distinguishable from the circumstances here in the Fifth Amendment context as well. The per-election limit at issue here applies equally to all candidates and contributors and is thus entirely different from the asymmetrical limits at issue in *Davis*, which did establish separate contribution limits for certain self-financed candidates, on the one hand, and their opponents, on the other.

*Davis* dictated the result in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2809 (2011), and *Arizona Free Enterprise* thus fails to support plaintiffs' arguments largely for the same reasons as *Davis*.  The petitioners in *Arizona Free Enterprise* challenged an Arizona statute providing that when a privately financed candidate raised or spent more that the state's initial grant to a publicly financed candidate, each personal dollar the privately financed candidate spent resulted in an award of almost one additional dollar to his opponent — what the Court characterized as "matching funds."  *Id.* at 2818.  Explaining that "the logic of *Davis* largely control[ed]" its approach to the case, the Court held that the Arizona matching fund provision violated the First Amendment.  The Court explained that the Arizona law penalized candidates who "robustly exercise[d]" their First Amendment rights, *id.* at 2818-19, and appeared to be designed to impermissibly level the playing field, *id.* at 2825.

The Court's holding in *Arizona Free Enterprise* hardly casts constitutional doubt on the $2,600 per-election limit. The per-election limit does not attempt to impermissibly level the playing field, nor does it treat any contributors or candidates differently from others.

*Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014), also does not provide any support for plaintiffs' claims. In *Riddle*, the Court of Appeals for the Tenth Circuit considered a Colorado statute that, as a result of the state's procedure for determining which candidates may appear on the general election ballot, allowed major-party candidates to "obtain $400 from a single contributor and spend all of the money in the general election," while restricting minor-party nominees and others to obtaining "only $200 from a single contributor." 742 F.3d at 924-27. Importantly, the challenged Colorado provision, unlike the limit at issue here, "effectively removed any potential time limitation on when a candidate committee could accept [or use] contributions when a primary is involved," *id.* at 924, and did "*not* set contribution limits based on who has a primary and who doesn't," *id.* at 926. The statute "blur[red] the distinction" between primary and general-election contributions to major-party candidates by permitting such candidates to collect both ostensibly primary-election contributions and general election contributions "after the primary" and to "spend all of the money in the general-election." *Id.* at 926. The Court of Appeals found that the law "created different contribution limits for candidates running against each other, and these differences have little to do with fighting corruption." *Id.* at 930. It thus invalidated the Colorado provision for violating the Equal Protection Clause of the Fourteenth Amendment. That holding, however, is inapposite here.

As explained above, FECA's per-election limits on individual contributions apply equally to all candidates and contributors for each election in which candidates participate. Unlike the Colorado provision, FECA's $2,600 limit applies to all contributors; it does not treat contributors

31

to certain candidates differently from contributors to other candidates. *Riddle* thus clearly does not support plaintiffs' equal protection claim here. As Judge Gorsuch noted in his concurring opinion in *Riddle*, "[t]he federal government regulates campaign contributions on a per-election basis and manages to do so without any of the discrimination found in Colorado statutory law." *Id.* at 933 (Gorsuch, J., concurring); *see id.* (suggesting that "[p]erhaps the State might follow th[e federal] model" to cure the constitutional deficiencies of the Colorado provision).

*     *     *

FECA's per-election limits on contributions by all persons to all candidates have been upheld by the Supreme Court under the First and Fifth Amendments, are closely drawn to match the sufficiently important interests of preventing actual and apparent corruption, create no classification from which a cognizable equal protection claim might arise, and, in any event, apply equally to all candidates and contributors. Plaintiffs are thus unlikely to succeed on the merits of any of their claims.

## III.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM

Plaintiffs also fail to meet their burden to show that they will suffer irreparable harm without the extraordinary remedy they seek. *Winter*, 555 U.S. at 22. "[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (citation and internal quotation marks omitted). Moreover, "the D.C. Circuit has set a high standard for irreparable injury, underscoring that the injury must be both certain and great." *Rufer, et al v. FEC,* No. 14-cv-837, 2014 WL 4076053, at 14 (D.D.C. August 19, 2014).

Plaintiffs proffer no evidence of any irreparable harm that they have suffered or will suffer by abiding by the same $2,600-per election limit that applies to everyone else in supporting their preferred candidates' general election campaigns. Instead, plaintiffs simply

reiterate their merits arguments, reasserting that their First and Fifth Amendment rights have been infringed.  But plaintiffs' "mere allegations, without more, do not support a finding of irreparable injury," even in the First (or Fifth) Amendment context.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-99 (D.C. Cir. 2006); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 76 (D.D.C. 2013) ("[T]he D.C. Circuit . . . require[s] movants to do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong of the preliminary injunction frame-work." (citations and internal quotation marks omitted)), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014).

Plaintiffs purport to rely on *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality), but that case does not support their position.  *Elrod* held that conditioning municipal employment on membership in a particular political party was an unconstitutional infringement on First Amendment rights.  *Id.* at 372.  That holding rested on the finding that government employees had already been "threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge," and it was "clear therefore that First Amendment interests were threatened or in fact being impaired at the time relief was sought."  *Id.* at 373.  *Elrod* did not eliminate a First Amendment plaintiff's burden to show that its interests are actually threatened or being impaired.  *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991) ("*NTEU*"); *Am. Meat Inst.*, 968 F. Supp. 2d at 76; *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013) (finding that "merely raising a constitutional claim is insufficient to warrant a presumption of irreparable injury"); *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 919 F.2d 148, 149-50 (D.C. Cir. 1990) (denying request for preliminary injunction to require local government to issue parade permit for planned march longer than had been approved; finding

33

*Elrod* not controlling on irreparable harm because allowing for shorter parade was not a denial of First Amendment rights); *Wis. Right to Life, Inc. v. FEC*, Civ. No. 04-1260, 2004 WL 3622736, at *4 (D.D.C. Aug. 17, 2004) (rejecting that plaintiff's reliance on *Elrod*).

Here, plaintiffs have alleged no governmental action against them whatsoever. *See NTEU*, 927 F.2d at 1255 ("Nothing in the record convinces us that the appellants will cease speaking or writing before the district court resolves their constitutional challenges."). The Commission has taken no action justifying an injunction resembling the threats that were present in *Elrod*. Plaintiffs have simply *voluntarily* chosen not to exercise their First Amendment rights to contribute to (or associate with) their preferred candidates during those candidates' primary campaigns. Plaintiffs themselves are responsible for the harm that they claim.

Plaintiffs also offer no reason why they could not have brought their challenge to the decades-old per-election limit sooner. Courts have found that irreparable injury is not present in the event of such self-created urgency. *See Tenacre Found. v. INS*, 78 F.3d 693, 695 n.2 (D.C. Cir. 1996) (finding that seven-month delay before filing suit "undermines any assertions that [plaintiff] will suffer irreparable harm if the Court does not grant preliminary injunctive relief"); *cf. Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[Plaintiff's] cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief.").

"This court has set a high standard for irreparable injury," and plaintiffs must "articulate a tangible injury that is either 'certain and great' or irreparable." *Chaplaincy*, 454 F.3d at 297-98. Plaintiffs have failed to do so and "'that alone is sufficient' for a district court to refuse to grant preliminary injunctive relief." *Hicks v. Bush*, 397 F. Supp.

2d 36, 40 (D.D.C. 2005) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58

F.3d 738, 747 (D.C. Cir. 1995)).

　　As another court in this District recently concluded in rejecting a motion to preliminarily

enjoin limits on contributions to political parties, "plaintiffs will not 'suffer irreparable harm in

the absence of preliminary relief'; they will simply be required to adhere to the regulatory regime

that has governed campaign finance for decades." *Rufer*, 2014 WL 4076053, at *7.

## IV.　THE RELIEF PLAINTIFFS REQUEST WOULD HARM THE GOVERNMENT AND UNDERCUT THE PUBLIC INTEREST

　　Restructuring FECA's individual contribution limits and/or permitting plaintiffs to make

contributions to certain candidates' general-election campaigns in amounts up to twice the

statutory limit would upset the entire federal campaign finance framework and undermine the

anti-corruption purpose of FECA shortly before a federal election, harming the public interest

and the government.  To prevail on their motion for a preliminary injunction, plaintiffs must

establish precisely the opposite. *CityFed. Fin. Corp.*, 58 F.3d at 746.  But they offer only a few

conclusory statements about unconstitutional laws.  (Pls' Mem. at 30-31.)  In fact, the statutory

provisions plaintiffs ask this Court to amend have been on the books for 40 years.  "The public

has a strong interest in the enforcement of laws passed by Congress and signed by the President."

*Wis. Right to Life, Inc. v. FEC*, No. 04-1260, 2006 WL 2666017, at *5 (D.D.C. Sept. 14, 2006).

There is a "presumption of constitutionality which attaches to every Act of Congress," and that

presumption is "an equity to be considered in favor of [the government] in balancing hardships."

*Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984).  As Chief Justice

Rehnquist stated in the similar context of a requested injunction pending appeal, "barring the

enforcement of an Act of Congress would be an extraordinary remedy." *Wis. Right to Life, Inc.*

*v. FEC*, 542 U.S. 1305, 1305 (2004) (Rehnquist, C.J., in chambers).  Granting plaintiffs' motion

for preliminary injunction would "substantially injure" the government and the public.  *CityFed*

*Fin.*, 58 F.3d at 746.  Indeed, "any time a State is enjoined by a court from effectuating statutes

enacted by representatives of its people, it suffers . . . injury."  *New Motor Vehicle Bd. of Cal. v.*

*Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).  The government

and the public are similarly harmed when a court proscribes enforcement of a federal statute.

"[E]njoining the FEC from performing its statutory duty constitutes a substantial injury to the

FEC."  *Wis. Right to Life*, 2006 WL 2666017, at *5; *see also Christian Civic League of Me., Inc.*

*v. FEC*, 433 F. Supp. 2d 81, 90 (D.D.C. 2006).

As Judge Cooper recently held in rejecting a request by the Libertarian National

Committee to preliminarily enjoin limits on contributions to political parties:

> The balance of equities does not tip in Plaintiffs favor, nor would an injunction be
> in the public interest.  Granting preliminary relief would upset the entire federal
> campaign finance framework only months prior to the next federal election . . . .
> Permitting that to happen would be imprudent, to say the least, and certainly not
> in the public interest.  The Supreme Court has made clear that "[t]he purpose of a
> preliminary injunction is merely to preserve the relative positions of the parties
> until a trial on the merits can be held."  Granting preliminary relief in this case
> would do precisely the opposite.

*Rufer*, 2014 WL 4076053, at *7.

## CONCLUSION

For all the foregoing reasons, plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted,

Lisa Stevenson
Deputy General Counsel – Law
(D.C. Bar No. 457628)
lstevenson@fec.gov

Kevin Deeley
Acting Associate General Counsel
kdeeley@fec.gov

Erin Chlopak (D.C. Bar No. 496370)
Acting Assistant General Counsel
echlopak@fec.gov

/s/ Steve N. Hajjar
Steve N. Hajjar
Benjamin A. Streeter III
Attorneys
shajjar@fec.gov
bstreeter@fec.gov

Federal Election Commission
999 E Street, N.W.
Washington, DC 20463
(202) 694-1650

September 8, 2014