# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAURA HOLMES, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ELECTION | ) Civil Action No. 1:14-cv-01243 (RMC) |
| COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## PLAINTIFFS' OPENING BRIEF REGARDING CERTIFICATION

Allen Dickerson, DC Bar No. 1003781
CENTER FOR COMPETITIVE POLITICS
124 West Street South, Suite 201
Alexandria, Virginia 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org

*Counsel for Plaintiffs*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iii

ARGUMENT ................................................................................ 1

I.  *Wagner's* Three-Step Process and the Scope of this Remand ....................... 1

II.  Developing a Record for Appellate Review ................................................. 2

III.  This case presents two constitutional questions that the Supreme Court has not decided ................................................................................. 6

    A.  The substantive question before this Court is whether Plaintiffs' specific claims, in the context of the facts of this case, are foreclosed by Supreme Court precedent ................................................. 6

    B.  The Supreme Court has neither considered nor decided whether the bifurcated contribution limit furthers the government's interest in preventing *quid pro quo* corruption ................................................. 14

        1.  First Amendment Analysis ................................................. 14

        2.  No court anticipated the effect on associational rights suffered by Plaintiffs and those similarly situated ................................................. 16

        3.  No court has considered the bifurcated limit under the Supreme Court's most recent pronouncement on closely drawn scrutiny, *McCutcheon v. FEC* ................................................. 18

    C.  The Supreme Court has neither considered nor decided whether the bifurcated limit denies some contributors equal protection of the law ................................................................................. 20

        1.  Equal Protection Analysis ................................................. 21

        2.  No court has considered whether bifurcating FECA's base limit can subject some contributors to asymmetric treatment violating

the Constitution—but the Supreme Court has suggested that it
might .......................................................................................22

3.    The only court to consider an analogous contribution regime
concluded that it violated the equal protection rights of the
contributor-plaintiffs there ........................................................27

D.    Plaintiffs do not challenge the dollar amount of the individual
contribution limit, so any deference traditionally afforded the
legislature in that context is not relevant here ...................................29

CONCLUSION ........................................................................................33

# TABLE OF AUTHORITIES

CASES

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
    131. S. Ct. 2806 (2011)...................................................................25, 26

*Buckley v. Valeo,*
    424 U.S. 1 (1976).............................................................................*passim*

*Buckley v. Valeo,*
    519 F.2d 817 (D.C. Cir. 1975).....................................................3, 4, 5, 14

*Buckley v. Valeo,*
    387 F. Supp. 135 (D.D.C. 1975)..............................................................3

*Cal. Med. Ass'n v. FEC,*
    53 U.S. 182 (1981)......................................................................2, 3, 7, 8

*Cao v. FEC,*
    688 F. Supp. 2d 498 (E.D. La. 2010) ........................................10, 11, 26

*Citizens Against Rent Control v. City of Berkeley,*
    454 U.S. 290 (1981)...............................................................................23

*Citizens United v. FEC,*
    558 U.S. 310 (2010)...............................................................................10

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)...............................................................................24

*Davis v. FEC,*
    554 U.S. 724 (2008)...................................................................24, 25, 26

*Davis v. PBGC,*
    571 F.3d 1288 (D.C. Cir. 2009)................................................................7

*Doe v. Reed,*
    561 U.S. 186 (2010)...............................................................................12

*FEC v. Colo. Republican Fed. Campaign Comm.*,

    533 U.S. 431 (2001)...............................................................10, 11

*FEC v. Nat'l Right to Work Comm.*,

    459 U.S. 197 (1982) ..................................................................15

*FEC v. Wis. Right to Life*,

    551 U.S. 449 (2007).....................................................................5

*Feinberg v. Fed. Deposit Ins. Corp.*,

    522 F.2d 1335 (D.C. Cir. 1975)....................................................8

*Goland v. United States*,

    903 F.2d 1247 (9th Cir. 1990) ...............................................6, 7, 9

*Khachaturian v. FEC*,

    980 F.2d 330 (5th Cir. 1992) ..............................................*passim*

*Libertarian Nat'l. Comm. v. FEC*,

    930 F. Supp. 2d. 154 (D.D.C. 2013)......................................13, 14

*Mariani v. United States*,

    212 F.3d 761 (3d Cir. 2000) .........................................................5

*McConnell v. FEC*,

    540 U.S. 93 (2003).....................................................................24

*McCutcheon v. FEC*,

    134 S. Ct. 1434 (2014)........................................................*passim*

*New York City Transit Auth. v. Beazer*,

    440 U.S. 568 (1979)...................................................................29

*News Am. Publ'g, Inc. v. FCC*,

    844 F.2d 800 (D.C. Cir. 1988)....................................................21

*Nixon v. Shrink Mo. G'vt PAC*,

    528 U.S. 377 (2000)...........................................................*passim*

*Randall v. Sorrell*

    548 U.S. 230 (2006)......................................................................23, 31, 32

*Republican Nat'l Comm. v. FEC (*In re *Anh Cao),*

    619 F.3d 410 (5th Cir. 2010) ...........................................................10, 12

*Riddle v. Hickenlooper*,

    742 F.3d 922 (10th Cir. 2014) ........................................................27, 28

*SpeechNow.org v. FEC,*

    567 F.Supp. 2d 70 (D.D.C. 2008) ..........................................................7

    2009 U.S. Dist. LEXIS 89011 (D.D.C. Sept. 28, 2009) ...........................7

*United States v. Windsor*,

    133 S. Ct. 2675 (2013)........................................................................21

*Wagner v. FEC,*

    717 F.3d 1007 (2013).....................................................................*passim*

*Winter v. NRDC,*

    555 U.S. 7 (2008)................................................................................7

*Wis. Right to Life v. FEC*,

    546 U.S. 410 (2006)...........................................................................12

*Yick Wo v. Hopkins*,

    118 U.S. 356 (1886)...........................................................................22

STATUTES, RULES & CONSTITUTIONS

11 C.F.R. § 110.3(c)(3)................................................................................16

52 U.S.C. § 30110 .............................................................................*passim*

52 U.S.C. § 30116(a)(1)(A)............................................................................6

52 U.S.C. § 30116(a)(6) ............................................................................6, 24

52 U.S.C. § 30116(c).................................................................................24

Other Authority

FEC, Campaign Guide: Congressional Candidates and Committees
(June 2014), *available at* http://www.fec.gov/pdf/campaigngui.pdf.......27

ARGUMENT

Pursuant to this Court's February 9, 2015 Order to Govern Proceedings, (Dkt. 24), Plaintiffs submit this Opening Brief Regarding Certification.

## I.   *Wagner*'s Three-Step Process and the Scope of this Remand

This case presents a narrow constitutional challenge, which Plaintiffs pursue under a compulsory statutory procedure. 52 U.S.C. § 30110.[1] Following this Court's certification of the constitutional questions in this case, the Court of Appeals scheduled oral argument. The FEC responded by moving for remand, arguing, *inter alia*, that the record certified was insufficient because it did not "reflect[] input from both parties." *E.g.,* FEC Motion for Remand at 17, *Holmes v. FEC*, (No. 14-5281) (D.C. Cir. Jan. 2, 2015). The Court of Appeals remanded the action in a one page, unpublished order:

> The court grants the motion to remand this 52 U.S.C. § 30110 (formerly 2 U.S.C. § 437h) case in order to provide the parties an opportunity to develop, by expedited discovery or otherwise, the factual record necessary for *en banc* review of the plaintiffs' constitutional challenge. It is further ordered that the district court shall complete the functions mandated by § 30110 and described in *Wagner v. FEC*, 717 F.3d at 1009, including the development of a record for appellate review, by April 24, 2015. The district court is to certify any constitutional question(s) by that date as well.

---

[1] Previously codified at 2 U.S.C. § 437h.

Order, *Holmes v. FEC*, (No. 14-5281) (D.C. Cir. Jan. 30, 2015) (*en banc*) (*per curiam*) (D.D.C. Dkt. 22) (citing *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981) ("*Cal. Med.*"); *Wagner v. FEC*, 717 F.3d 1007, 1009 (2013)).

Pursuant to that order, the scope of this remand is governed by *Wagner v. FEC*, which provides that:

> Under [§ 30110], a district court should perform three functions. First, it must develop a record for appellate review by making findings of fact. *See Bread Political Action Comm. v. FEC*, 455 U.S. 577, 580 (1982); *Buckley v. Valeo*, 519 F.2d 817, 818-19 (D.C. Cir. 1975) (per curiam). Second, the district court must determine whether the constitutional challenges are frivolous or involve settled legal questions. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981); *Khachaturian v. FEC*, 980 F.2d 330, 331 (5th Cir. 1992) (*en banc*) (per curiam); *Goland v. United States*, 903 F.2d 1247, 1257 (9th Cir. 1990). Finally, the district court must immediately certify the record and all non-frivolous constitutional questions to the *en banc* court of appeals. *See Cal. Med.*, 453 U.S. at 192 n.14; *see also Mariani v. United States*, 212 F.3d 761, 769 (3d Cir. 2000) (*en banc*).

717 F.3d at 1009. *Wagner* provides a clear roadmap, which Plaintiffs follow below.

## II.    Developing a Record for Appellate Review

In remanding this case, the Court of Appeals suggested that the FEC should be given an opportunity to conduct discovery, and asked this Court to thereafter develop a factual record adequate for appellate review. The Commission has now had that opportunity, and has been invited to suggest additional facts for certification. Without prejudging that effort, Plaintiffs believe that the facts this

Court previously certified were adequate. Consequently, Plaintiffs propose only modest additions in their Proposed Facts for Certification, submitted contemporaneously with this Opening Brief.

The Court of Appeals has required this Court and the Parties to act expeditiously. Order ("the district court shall complete the functions mandated by § 30110 and described in *Wagner v. FEC*, 717 F.3d at 1009, including the development of a record for appellate review, by April 24, 2015. The district court is to certify any constitutional question(s) by that date as well."). This schedule is consistent with decades of § 30110 jurisprudence recognizing that "Congress's objective when it enacted [§ 30110]… was, and is, speed." *Wagner*, 717 F.3d at 1013 n.6. Speed is necessary because of "the public's interest in having questions of FECA's constitutionality speedily resolved." *Id.* at 1013. A long line of cases reiterate this principle. *See e.g., Cal. Med.*, 453 U.S. at 188 (Congress enacted [§ 30110] as "method for obtaining expedited review of constitutional challenges to the [FECA]"); *Buckley v. Valeo*, 387 F. Supp. 135, 138 (D.D.C. 1975) ("The very essence of [§ 30110]…is speedy judicial review") *remanded on other grounds* 519 F.2d 817 (D.C. Cir. 1975) (*en banc*) (per curiam); *but see Buckley*, 519 F.2d at 819 (noting the "intention of Congress for expedition in appellate disposition").

Both this extensive precedent and the Court of Appeals' order emphasize the speed with which this Court must act. Thus, neither Congress nor the appellate

court anticipate a substantial period of discovery, or the need for extensive factual findings (or the motion practice, extensive evidentiary hearings, expert testimony, and other time consuming steps necessary to develop and vet a lengthy record). Extraneous information—including general statements, characterizations of law, or details unrelated to the constitutional issues Plaintiffs present—need not (and should not) be made part of the certified record.

Of course, this Court must certify sufficient facts to resolve the constitutional questions at bar—a task lower courts have not always completed to the satisfaction of the Courts of Appeals. For example, when *Buckley v. Valeo* first came before the D.C. Circuit, it remanded the case, instructing the district court to "[t]ake whatever may be necessary in the form of evidence over and above submissions that may suitably be handled through judicial notice." 519 F.2d 817, 818 (D.C. Cir. 1975) (*en banc*) (per curiam). Similarly, in *Khachaturian v. FEC*, the district court considered *no* briefing and made *no* factual findings. 980 F.2d 330, 332 (5th Cir. 1992). In fact, Khachaturian filed his complaint and motion to expedite on September 29, 1992—and that complaint constituted the *entirety* of the record sent to the *en banc* Court of Appeals. *Khachaturian*, No. 92-3232 (E.D. La. 1992) (Dkts. 1 and 2). The FEC was not even given time to answer Khachaturian's complaint. 980 F.2d at 332. This, of course, resulted in a record insufficient to

decide Mr. Khachaturian's constitutional questions. But neither *Buckley* nor *Khachaturian* is, on this point, remotely similar to Plaintiffs' case.

While an adequate record must be developed, the caselaw also overwhelmingly holds that unnecessary discovery and factfinding are inappropriate. *See, e.g., Buckley v. Valeo*, 519 F.2d at 818 (ordering district court to "[t]ake whatever may be *necessary* in the form of evidence") (emphasis supplied); *Wagner* at 1017 (district court need only "make appropriate findings of facts, *as necessary*, and to certify those facts…") (emphasis supplied); *Mariani v. United States*, 212 F.3d 761, 765 (3d Cir. 2000) (noting, in a challenge to FECA, that "some of the District Court's findings [we]re unsupported by proper evidence and that some stray[ed] from appropriate fact finding into legal conclusions").[2]

Given the authority supporting a limited approach to discovery and factual development, it is hardly fatal to this expedited review procedure when, as it did in *Wagner*, § 30110 "results in a less-focused record than ordinary litigation." 717 F.3d at 1015. Moreover, from a practical standpoint, a lengthy record is not needed. This case concerns a specific, narrow problem: the constitutional implications of a law which, under a specific and recurring set of circumstances,

---

[2] Likewise, challenges to the Bipartisan Campaign Reform Act of 2002 ("BCRA") proceed under a parallel judicial review procedure. The Supreme Court held that BCRA challenges "must entail minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation." *FEC v. Wis. Right to Life*, 551 U.S. 449, 469 (2007) (emphasis added).

denies contributors like the Plaintiffs the same constitutional rights that other contributors enjoy, and does so without appreciably furthering the government's anticorruption efforts.

A succinct record is sufficient to demonstrate that bifurcation of the candidate contribution limit between primary and general elections violates the First and Fifth Amendments as applied to Plaintiffs and those similarly situated. 52 U.S.C. §§ 30116(a)(1)(A); 30116(a)(6). Plaintiffs' own experience demonstrates that favored contributors may give their preferred candidates $5,200 for the general election, while Plaintiffs and those similarly situated may not. On the other hand, it is the FEC's burden to show that its anticorruption interests are served by bifurcating contribution limits—as opposed to the limits themselves. Thus, we turn to the second task set out by the *Wagner* Court: "determin[ing] whether the constitutional challenges are frivolous or involve settled legal questions." *Id.* at 1009 (citing *Cal. Med.*, 453 U.S. at 192, n.14; *Khachaturian v. FEC*, 980 F.2d at 331; *Goland v. United States*, 903 F.2d 1247, 1257 (9th Cir. 1990)).

**III.   This case presents two constitutional questions that the Supreme Court has not decided.**

**A.   The substantive question before this Court is whether Plaintiffs' specific claims, in the context of the facts of this case, are foreclosed by Supreme Court precedent.**

The certification of constitutional questions is not discretionary: "the plain text of [§ 30110] grants *exclusive* merits jurisdiction to the *en banc* court of

appeals." *Wagner* at 1011 (emphasis supplied). *See also* Certification of Questions of Constitutionality of Federal Election Campaign Act at 1-2 (Dkt. 18) (this Court recognizing same).[3] The relevant test is straightforward. Constitutional issues must be certified unless the Supreme Court has already decided the questions presented.

---

[3] This Court first considered this case on a preliminary injunction motion, which is

> an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief….[and is] never awarded as of right…A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Winter v. NRDC,* 555 U.S. 7, 22, 24, 20 (2008). Given the remedy's exceptional nature, a "movant has the burden to show that all four factors…weigh in favor of the injunction." *Davis v. PBGC*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

By contrast, under § 30110, certification is required, with a limited exception for questions that are frivolous or matters of settled law. *See, e.g., Cal. Med.*, 453 U.S. at 192 n. 14. Consequently, the rigorous standard for preliminary relief is distinct from the statutory path to *en banc* review. Certification is a right provided by Congress, not "an extraordinary remedy that may only be awarded upon a clear showing." *Winter*, 555 U.S. at 22.

Similarly, certification does not require a multi-factor test, or impose a weighty burden on parties seeking it. Instead, there is a presumption in favor of certification: the showing required is minimal, akin to that required to survive a motion to dismiss under FED. R. CIV. P. 12(b)(6). *Goland v. United States*, 903 F.2d 1247, 1257-58 (9th Cir. 1990) (comparing [§ 30110] certification standard to three judge court provision of 28 U.S.C. § 2284, and describing the showing required as "closely resembl[ing] that applied under Rule 12(b)(6)"). *Compare, e.g., SpeechNow.org v. FEC*, 567 F.Supp. 2d 70 (D.D.C. 2008) (denying plaintiffs' motion to enjoin enforcement of certain contribution limits under § 30110); 2009 U.S. Dist. LEXIS 89011 (D.D.C. Sept. 28, 2009) (certifying constitutional questions to the *en banc* Court of Appeals)).

*Wagner*, 717 F.3d at 1009 (collecting cases). In *Cal. Med.*, Justice Marshall described this test as one of substantiality or settled law ("the issues here are neither insubstantial nor settled. We therefore conclude that this case is properly before us pursuant to § [30110].") 453 U.S. at 192 n.14. The *en banc* Fifth Circuit stated that a "district court need not certify legal issues that have been resolved by the Supreme Court." *Khachaturian v. FEC*, 980 F.2d at 331; *see also, e.g., Feinberg v. Fed. Deposit Ins. Corp.*, 522 F.2d 1335, 1339 (D.C. Cir. 1975) (constitutional question is "substantial" for purposes of certification to three-judge court unless Supreme Court has "foreclose[d] the subject" and left "no room for the inference that the question sought to be raised can be the subject of controversy"). However phrased, the heart of the inquiry is the same: whether a case challenging the same provision, under the same legal theory, premised upon the same or similar facts, has been presented to and decided by the Supreme Court.

*Khachaturian v. FEC* is instructive. In that case, "Khachaturian argue[d] that the [individual contribution] limit [was] unconstitutional as applied to his independent candidacy. However, *Buckley* considered, and rejected, claims that the contribution limit invidiously discriminates against independent and minor-party candidates as a class." 980 F.2d at 331 (citing 424 U.S. at 33-35). This was correct: the *Buckley* Court had specifically stated that "the record [before it was] virtually devoid of support for the claim that the [then] $ 1,000 contribution limitation

w[ould] have a serious effect on the initiation and scope of minor-party and independent candidacies." 424 U.S. at 34. Thus, the Supreme Court had considered *the precise claim* Mr. Khachaturian raised—that the individual contribution limit was unconstitutional in the context of an independent candidate. Further, Khachaturian had not shown that his situation was any different from that of the minor-party and independent candidates that *Buckley* had considered. 980 F.3d at 331. As a result, it had been improper to certify the question.

The threshold inquiry, then, is not whether the offending statute has ever before been subject to a constitutional challenge. Instead, it is whether the particular questions the plaintiffs ask the court to certify, on the particular facts of their situation, present a novel application of the law that has not been ruled upon by the Supreme Court. *Goland v. United States*, for example, emphasized that it is not the specific provision of law at issue that determines a question's substantiality, but the factual posture and legal theory undergirding the case itself. 903 F.2d 1247 (9th Cir. 1990). There, the plaintiff funneled over $120,000 through 56 people to fund campaign ads without disclosing his identity. *Id.* at 1251. After being indicted for violating FECA, he challenged the statute's application to him and sought certification to a three-judge court under the predecessor to § 30110. *Id.* at 1252. The Ninth Circuit dismissed as "sophistic" and "creative" Goland's suggestion that, because he contributed anonymously, the individual contribution limit upheld

in *Buckley* was inapplicable to him. *Id.* at 1257, 1258. Even in doing so, the Court of Appeals reiterated: "[o]nce a core provision of FECA has been reviewed and approved by the courts, unanticipated variations also may deserve the full attention of the appellate court." *Id.* at 1257. *See also, e.g., Citizens United v. FEC*, 558 U.S. 310, 373 (2010) (opinion of Roberts, C.J.) (noting the Court's practice "'never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied'") (citing *United States* v. *Raines*, 362 U.S. 17, 21 (1960)) (quoting *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration*, 113 U.S. 33, 39 (1885)).

*Cao v. FEC,* on the other hand, illustrates when a question *is* appropriate for certification. 688 F. Supp. 2d 498 (E.D. La. 2010) *aff'd som. nom. Republican Nat'l Comm. v. FEC* (In re *Anh Cao*), 619 F.3d 410 (5th Cir. 2010). There, the United States District Court for the Eastern District of Louisiana certified several questions to the Fifth Circuit. Among them was whether the $ 5,000 contribution limit on PAC-to-candidate contributions under 2 U.S.C. § 441a(a)(2)(A)[4] was unconstitutional as applied to a political party's PAC. Importantly, this PAC-to-candidate contribution limit had been upheld in prior Supreme Court cases, including *Buckley v. Valeo*, 424 U.S. at 36, and *FEC v. Colo. Republican Federal Campaign Comm.*, 533 U.S. 431, 438-39 (2001) ("*Colorado II*"). Nevertheless, the

---

[4] Recodified at 52 U.S.C. § 30116(a)(2)(A).

*Cao* plaintiffs brought a challenge based upon Supreme Court dicta noting the especially important role of established political parties in the electoral system. Given that central role, the plaintiffs argued, a political party's PAC should not be subject to the PAC-to-candidate contribution limit. *Cao*, 688 F. Supp. 2d at 547.

The *Cao* district court concluded that this question was appropriate for certification because the Supreme Court had never directly considered that argument. "*Buckley* mentioned the predecessor to [the PAC-to-candidate limit], but did so only in the context of discussing *ad hoc* political groups as opposed to 'established interest groups.' Political parties were not mentioned, nor was the constitutionality of undifferentiated limits." *Id*. (quoting 424 U.S. at 36). The district court continued: "the portion of *Colorado II* cited by the FEC dealt exclusively with coordinated expenditures, not contributions," and "contributions and expenditures require distinct constitutional analysis." *Id*.

*Cao* found further grounds for certification in the Supreme Court's post-*Buckley* jurisprudence: "In fact, the *Colorado II* court suggested that political parties might warrant additional constitutional protections, but declined to address the question." *Id*. (citing 533 U.S. at 448-49). The district court concluded that an "acknowledgment by the high court that parties may possess uniquely protected associational rights is sufficient for this Court to hold that [the question was] non-frivolous." *Id*.

The *en banc* court ultimately rejected the *Cao* plaintiffs' argument that political party PACs should not be subject to the same contribution limit as other PACs. In re *Anh Cao*, 619 F.3d 410 (5th Cir. 2010). But that is not relevant here. What is relevant is that the question was properly certified because, although the underlying statute had been twice upheld by the Supreme Court, plaintiffs brought a novel claim based upon a different application of that statute to different facts.

Given this fact-bound determination, the as-applied nature of Plaintiffs' case further supports certification. The importance of the as-applied path to constitutional litigation is well established, and applies as broadly in the context of political law as any other. For example, in *Doe v. Reed*, the Court "note[ed]—as [it had] in other election law disclosure cases—that upholding the law against a broad-based challenge does not foreclose a litigant's success in a narrower one." 561 U.S. 186, 201 (2010) (citation omitted). Similarly, in upholding a BCRA provision against a facial attack, the Supreme Court took pains to reiterate that it "did not purport to resolve future as-applied challenges." *Wis. Right to Life v. FEC*, 546 U.S. 410, 411-12 (2006). As in *Cao*, courts have found that narrow, as-applied challenges are sufficiently "substantial" for certification, even when those cases concern contribution limits upheld facially by the Supreme Court.

Plaintiffs do not dispute that *Buckley v. Valeo* foreclosed challenges to the general imposition of individual contribution limits. 424 U.S. at 28-29 (facially

upholding individual limits as targeted to "the narrow aspect of political association where the actuality and potential for corruption have been identified"). The difference here is that Plaintiffs challenge the bifurcation itself, and its application in situations where candidates run unopposed in their primaries before going on to face candidates in the general election who had previously participated in a competitive primary. The FEC can point to no case—in the Supreme Court or elsewhere—that has even considered the bifurcation of the overall limit, let alone subjected it to the closely drawn scrutiny the Constitution requires. It has cited no precedent that contemplates the Plaintiffs' circumstance. Thus, Plaintiffs' constitutional questions are appropriate for certification.

Moreover, even if this Court does not conclude that Plaintiffs have articulated a certifiable question, if the *facts* of their case present such a question, certification should proceed. Indeed, "[t]his Court has the power, and apparently the duty, to identify the constitutional issues and to reframe the question as necessary so that any proper non-frivolous question is certified to the *en banc* Court of Appeals." *Libertarian Nat'l. Comm. v. FEC*, 930 F. Supp. 2d. 154, 169 (D.D.C. 2013) (granting in part and denying in part plaintiff's request to certify questions under [§ 30110]). In *LNC v. FEC*, Judge Wilkins found that that the proposed certified question in a facial challenge was foreclosed by facial Supreme Court rulings. *Id.* at 165. Nevertheless, the court concluded that "on th[o]se facts, it

appear[ed] that the anti-corruption interests that would be implicated by [the contribution limit challenged there] may be minimal." *Id.* at 171. Thus, "[a]fter a careful review of the parties' positions, the facts, and the current state of the law in this area, this Court conclud[ed] that, although the question presented by the LNC for certification does not merit review by the *en banc* Court of Appeals, there is a valid, narrower constitutional question raised by the [facts of the case] that presents an as-applied challenge that should be certified." *Id*.

Finally, the mere fact that this case was remanded does not change the certification requirements or imply that this Court was incorrect to certify the constitutional questions presented. As the procedural trajectories of cases like *Buckley v. Valeo* and *Khachaturian v. FEC* illustrate, a remand declining to decide the merits of a case does not purport to resolve those merits on re-certification. 519 F.2d 817; 980 F.2d 330. Consequently, Plaintiffs request recertification of the constitutional questions previously submitted to the Court of Appeals.

**B.** **The Supreme Court has neither considered nor decided whether the bifurcated contribution limit furthers the government's interest in preventing *quid pro quo* corruption.**

**1.** **First Amendment Analysis**

Plaintiffs concede that the government may limit individual political contributions. Indeed, as a general matter, "contribution limits impose a lesser restraint on political speech [than expenditures do] because they 'permit[ ] the

symbolic expression of support evidenced by a contribution but do[ ] not in any way infringe the contributor's freedom to discuss candidates and issues.'" *McCutcheon v. FEC*, 134 S. Ct. 1434, 1444 (2014) (quoting *Buckley*, 424 U.S. at 21) (*Buckley* alterations in *McCutcheon*). Plaintiffs further acknowledge that, although government "action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny," strict scrutiny does not apply to individual to candidate contribution limits. *Buckley*, 424 U.S. at 25; *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 207 (1982) (both citing *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958)).

Still, when First Amendment rights are at stake, the Supreme Court places the burden of persuasion upon the government, holding that "even a significant interference with protected rights of political association [including contribution limits] may be sustained *if the State* demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley*, 424 U.S. at 25 (citations and quotation marks omitted) (emphasis supplied); *see also, e.g., Nixon v. Shrink Mo. G'vt. PAC*, 528 U.S. 377, 392 (2000) (referring to "government's burden to justify limits on contributions"). That is, to survive a First Amendment challenge, an association-suppressing law must target a sufficiently important and non-illusory interest, and be closely drawn thereto.

15

### 2.   No court anticipated the effect on associational rights suffered by Plaintiffs and those similarly situated.

The preeminent case in this area of law, *Buckley v. Valeo,* did not contemplate a situation like the Plaintiffs' where (1) FECA itself creates an unfair advantage, and (2) that unfair advantage privileges certain contributors over others. *Compare Buckley* 424 U.S. at 31 (FECA "applies the same limitations on contributions to all candidates.")  What's more, the redesignation provision which allows for this result in the first place, 11 C.F.R. § 110.3(c)(3), received not a single mention in the *Buckley* opinion.

What the Supreme Court *has* made clear is that the only constitutionally cognizable justification for contribution limits is the prevention of actual or apparent *quid pro quo* corruption.  *McCutcheon*, 134 S. Ct. at 1450; *Buckley*, 424 U.S. at 25; *see also Nixon v. Shrink Mo.*, 528 U.S. at 388. As Chief Justice Roberts explained

> In a series of cases over the past 40 years, we have spelled out how to draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech. We have said that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. Ingratiation and access…are not corruption. They embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns.

> Any regulation must instead target what we have called *quid pro quo* corruption or its appearance. That Latin phrase captures the notion of

a direct exchange of an official act for money. The hallmark of corruption is the financial *quid pro quo*: dollars for political favors. Campaign finance restrictions that pursue other objectives, we have explained, impermissibly inject the Government into the debate over who should govern. And those who govern should be the *last* people to help decide who *should* govern.

*McCutcheon*, 134 S. Ct. at 1441-42 (citations and quotation marks omitted) (emphasis original).

Consequently, it is beyond dispute that contribution limits must target this understanding of *quid pro quo* corruption. It follows, then, that the government must offer more than a naked assertion of a "corruption" interest to justify a burden on the right to associate via political contributions. *Nixon v. Shrink Mo.*, 528 U.S. at 392 (citing and discussing *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 616 (1996) (opinion of Breyer, J.)). "In the First Amendment context, fit matters." *McCutcheon*, 134 S. Ct. at 1456. This is where closely drawn scrutiny comes in: a contribution limit must be closely drawn to the government's interest in preventing actual or apparent *quid pro quo* arrangements—dollars for favors. Otherwise, it is unconstitutional. *McCutcheon*, 134 S. Ct. at 1462.

No court has considered the constitutionality of bifurcating the individual limit on candidate contributions, either facially or as applied, under this standard. Further, the FEC has not suggested a justification, except to baldly (and without evidence) assert a vague anticorruption interest.

One cannot corrupt an abstract concept such as an election. What may be

corrupted is a *candidate*. From that standpoint, a limit on how much money may be given to candidates may well further Congress's legitimate interest. But the FEC has never shown what additional work is being done by bifurcating that limit. This is especially so where, in the not-uncommon instance of a candidate facing little or no primary opposition, that bifurcation is itself illusory. *Cf. Nixon v. Shrink Mo.*, 528 U.S. at 392 (the Supreme Court "[has] never accepted mere conjecture as adequate to carry a First Amendment burden.").

**3.** **No court has considered the bifurcated limit under the Supreme Court's most recent pronouncement on closely drawn scrutiny, *McCutcheon v. FEC*.**

*McCutcheon* refined the contours of the required First Amendment analysis, but it is only the latest in the series of cases explaining the scope of the government's interest in combating *quid pro quo* corruption. *See McCutcheon*, 134 S. Ct. at 1441 ("In a series of cases over the past 40 years…"). Consequently, even if the bifurcated limit had, on similar facts, been subject to First Amendment scrutiny in the past (which it has not), it could not have been evaluated under *McCutcheon*. This is important because *McCutcheon strengthened* the exacting scrutiny standard in the contribution context, making quite clear that the government must show a particular type of anticorruption rationale—*quid pro quo* corruption, narrowly understood. What's more, it must do so without resorting to unsubstantiated hypotheticals; in invalidating the aggregate contribution limits,

18

*McCutcheon* noted a dearth of "real-world examples of circumvention of the base limits" that the aggregate limits were designed to prevent. *Id.* at 1456. "This sort of speculation," the Court concluded, "cannot justify the substantial intrusion on First Amendment rights at issue in this case." *Id.*

Moreover, in evaluating the government's anticorruption claims, *McCutcheon* considered the total limit on any one individual's contributions to any one candidate *without respect to the distinction between primary and general elections*. *Id.* at 1448 ("if all contributions fall within the base limits Congress views as adequate to protect against corruption. The individual may give up to $5,200 each to nine candidates"); *Id.* at 1451 ("under the dissent's view, it is perfectly fine to contribute $5,200 to nine candidates but somehow corrupt to give the same amount to a tenth"). Thus, the Court clarified that "Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption." *Id.* at 1452. Consequently, preventing Plaintiffs' desired contributions—a total of $5,200 to any given candidate during a general election—does not further an anti-corruption interest.

The FEC's defense of the bifurcated limit suffers from the same infirmities that were fatal in *McCutcheon*. Bifurcation prevents Plaintiffs and those similarly situated from giving the full, non-corrupting contribution amount at the time they feel is most critical in the electoral cycle. If a contributor wishes to fully associate

19

with a candidate who must run in a competitive primary, the bifurcated limit forces that contributor to associate with the candidate during a primary election. This is so even for contributors who simply wish to support candidates in the general election (when, after all, one's representatives are actually elected) along party lines. As the Supreme Court has noted, also in the contribution limit context, "[s]uch distinctions in degree become significant…when they can be said to amount to differences in kind." *Buckley*, 424 U.S. at 30 (citations omitted). Like the aggregate limit on individual contributions considered in *McCutcheon*, "[a]t that point, the limits deny the individual all ability to exercise his expressive and associational rights by contributing to someone who will advocate for his policy preferences," a "clear First Amendment harm[]." *Id.* at 1448-49.

Thus, it is appropriate for this Court to certify Plaintiffs' First Amendment challenge to the Court of Appeals.

**C.    The Supreme Court has neither considered nor decided whether the bifurcated limit denies some contributors equal protection of the law.**

As Plaintiffs have noted throughout this litigation, their challenge is not based on an incumbent/challenger distinction, but rather on the asymmetry posed when a candidate who faces a primary challenge competes in the general election against a candidate who ran virtually unopposed during the primary. In 2014, the only difference between the Plaintiffs and contributors to their preferred

candidates' general election opponents was that a contributor to Congressman Loebsack or Congressman Peters could give $5,200 solely for use in the general election, while Mr. Jost and Ms. Holmes were denied that same ability. Certainly, this also occurred in other races, and will continue to occur in future electoral cycles. *See, e.g.,* Certification of Questions of Constitutionality of Federal Election Campaign Act at 6 (Dkt. 18) ("Plaintiffs' complaint is not mooted by the November 4, 2014 election inasmuch as the same limitations would apply to their contributions in the next federal election in which they wish to contribute to a candidate.")

Plaintiffs challenge this result under the doctrine of equal protection.

### 1.      Equal Protection Analysis

This unequal treatment infringes upon the "liberty protected by the Fifth Amendment's Due Process Clause…against denying to any person the equal protection of the laws." *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013); *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 804 (D.C. Cir. 1988) ("Although the Equal Protection Clause appears only in the [Fourteenth] Amendment, which applies only to the states, the Supreme Court has found its essential mandate inherent in the Due Process Clause of the Fifth Amendment[,] and therefore applicable to the federal government"). The equal protection doctrine's "broad and benign provisions" render invalid any law which may "itself be fair on its face and

impartial in appearance, yet...is applied...so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374 (1886).

The First Amendment's protective scope encompasses the freedom to associate, which the Supreme Court has long considered a "basic constitutional freedom" that "lies at the foundation of a free society." *Buckley*, 424 U.S. at 25 (citation and quotation marks omitted). This is black letter law. *E.g., Nixon v. Shrink Mo.*, 528 U.S. at 386 (limits on the right to contribute implicate "the constitutional guarantee" of associational liberty, which "has its fullest and most urgent application precisely to the conduct of campaigns for political office") (citing *Buckley*, 424 U.S. at 15-16, (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971))). Indeed, just last Term, the Supreme Court noted that "[t]here is no right more basic in our democracy than the right to participate in electing political leaders...[such as by] contribut[ing] to a candidate's campaign." *McCutcheon*, 134 S. Ct. at 1440-41.

> **2.** **No court has considered whether bifurcating FECA's base limit can subject some contributors to asymmetric treatment violating the Constitution—but the Supreme Court has suggested that it might.**

In reviewing contribution limits, the Supreme Court has largely considered challenges by candidates or political committees from the perspective of a contribution's *recipient*, not that of the contributor herself. The *Buckley* Court's

decision to uphold the individual contribution limits in FECA, for instance, was grounded in a record that focused on the candidates and parties involved. 424 U.S. at 33. It did not specifically address the right to equal protection at issue here: the one held by contributors. Moreover, the *Buckley* Court only considered a facial challenge to the contribution limits, and did not consider the effects of separate limits for primary and general elections.

Indeed, the principal cases discussing contribution limits tend consider whether the limits create "restraint[s] on the right of association…[by] hobbl[ing] the collective expressions of a group." *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 296 (1981). Even when contributors have themselves brought suit, these contributor-plaintiffs generally have mounted a wholesale challenge to the limits themselves—not the asymmetric classification of different types of contributors. *E.g. Randall v. Sorrell*, 548 U.S. 230, 239-40 (2006).

Moreover, as this Court itself has noted, the Supreme Court "has not addressed the scrutiny applicable to a challenge to restrictions on political contributions under an equal protection rubric." Memorandum Opinion Denying Preliminary Injunction at 10 (Dkt. 15). This alone suggests that Plaintiffs' equal protection challenge has not been ruled upon by the Court; presumably such a

ruling would have mentioned the level of scrutiny it was applying.[5] Moreover, "the preferred course of adjudication" is to strike down a law only as it applies to those unconstitutionally burdened. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). Thus, it is unsurprising when a court declines to reach the merits of a Fifth Amendment claim where other grounds for decision are available.

Nevertheless, the Supreme Court has consistently looked askance at asymmetric campaign finance regulations. In *Davis v. FEC*, for example, a self-financed congressional candidate brought First and Fifth Amendment challenges to BCRA's "millionaire's amendment." 554 U.S. 724, 729 (2008) (discussing BCRA § 319(a), formerly 2 U.S.C. § 441a-1(a)). That provision of BCRA allowed congressional candidates who were opposed by self-financed candidates to receive individual contributions at three times the statutory level. The Court found in Plaintiff's favor on First Amendment grounds and, as a result, did not reach his Fifth Amendment claim. Nevertheless, the Court's analysis is instructive, as it

---

[5] In 2002, Congress amended FECA by passing the Bipartisan Campaign Reform Act ("BCRA"). BCRA § 307 doubled the individual contribution limits, and indexed the limits to the consumer price index. 52 U.S.C. § 30116(c) (formerly 2 U.S.C. § 441a(c)). BCRA left FECA's distinction between primary and general elections undisturbed. 52 U.S.C. § 30116(a)(6) (formerly 2 U.S.C. § 411a(a)(6)). Like FECA, BCRA was quickly challenged facially by a number of plaintiffs. *McConnell v. FEC*, 540 U.S. 93 (2003). Nevertheless, no *McConnell* plaintiff challenged the bifurcation of those limits. A number of plaintiffs challenged BCRA's increase in individual contribution limits, but did not challenge the limit's bifurcation between the primary and general elections. The *McConnell* Court declined to reach that issue for want of jurisdiction. 540 U.S. at 227-29 (plaintiffs challenging increase failed to demonstrate Article III standing).

noted the provision's "effect of enabling [plaintiff's] opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of" other candidate speech. *Davis*, 554 U.S. at 750. This holding is further instructive insofar as it recognized that "[w]e have never upheld the constitutionality of a law that imposes different contributions for candidates who are competing against each other, and we agree with Davis that this scheme impermissibly burdens his First Amendment right to spend his own money for campaign speech." *Id.* at 738.

Similarly, in *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, the Supreme Court struck down an Arizona public financing regime based, in part, on its asymmetric effect (although not specifically under the Equal Protection Clause). 131. S. Ct. 2806, 2819 (2011). Arizona's system provided that "a publicly financed candidate would receive roughly one dollar for every dollar spent by an opposing privately financed candidate" or an independent group supporting such a candidate. *Id.* at 2813. In rejecting that state's approach, the Court relied upon *Davis*. *Id.* at 2818 ("The logic of *Davis* largely controls our approach to this case"). But it also noted an asymmetry problem: some Arizona districts, including its state House districts, elected more than one candidate.[6] Consequently, "each dollar spent by the

---

[6] *Id.* at 2815 ("Arizona is divided into 30 districts for purposes of electing members to the State's House of Representatives. Each district elects two representatives to

privately funded candidate would result in an additional dollar of campaign funding to *each* of that candidate's publically financed opponents." *Id.* at 2819 (emphasis supplied). The Court stated that, in such circumstances, candidates would be required "to fight a political hydra of sorts." *Id.*

This was equally, if not especially, true for independent groups who, in speaking for or against a candidate, would trigger direct cash payments to their opponents. *Id.* ("spending one dollar can result in the flow of dollars to multiple candidates the group disapproves of"). These passages can only be read as expressing the Court's concern, explicitly raised in both *Buckley* and *Davis,* that governments might impermissibly violate constitutionally safeguarded political rights by providing some with advantages over others.

Thus, the Supreme Court has determined that where contribution limits work asymmetrical effects, they threaten fundamental freedoms and may be unconstitutional. Because it has never reached the merits of an equal protection challenge to contribution limits—but *has* suggested, in *Davis* and *Ariz. Free Enterprise Club PAC*, that such a challenge might be appropriate—Plaintiffs' equal protection challenge to the bifurcated limit should be certified. *See, Cao v. FEC*, 688 F. Supp. 2d at 547 ("acknowledgment by the high court that parties may

---

the House biannually. In the last general election, the number of candidates competing for the two available seats in each district ranged from two to seven").

possess uniquely protected associational rights is sufficient for this Court to hold that [the question was] non-frivolous").

> ### 3. The only court to consider an analogous contribution regime concluded that it violated the equal protection rights of the contributor-plaintiffs there.

While the Supreme Court has never reached the merits of any contributor's equal protection challenge to an asymmetrical contribution limit, the Tenth Circuit has. *Riddle v. Hickenlooper*, 742 F.3d 922, 930 (2014). *Riddle* contemplated a slightly different factual posture, but addressed a parallel constitutional claim: that a contribution limit operated asymmetrically, in violation of equal protection. The case involved a Colorado law permitting uncontested major party candidates to receive contributions for the primary and general elections—just as federal law permits now. *Id*. at 924 (Contributions for both elections allowed "even when there is only one candidate seeking the nomination" of a major party). These primary and general election contributions could—as in the federal system—all be spent in the general election. *Id*. at 926; FEC, CAMPAIGN GUIDE: CONGRESSIONAL CANDIDATES AND COMMITTEES (June 2014) at 21, *available at* http://www.fec.gov/pdf/campaigngui.pdf ("Nevertheless, the campaign of a candidate running in the general election may spend unused primary contributions for general election expenses"). But candidates seeking the nomination of other, non-major parties, could receive primary contributions "only when multiple

27

candidates vie for the nomination." *Id*. at 926. Other candidates who did not run in a primary—such as independent or write-in candidates—were also barred from accepting primary election money. *Id*. at 927.

The *Riddle* plaintiffs, like Ms. Holmes and Mr. Jost, sought to contribute the full primary and general election amount to a general election candidate (in *Riddle*, a write-in candidate). The Tenth Circuit found no cognizable anti-corruption interest in "creat[ing] a basic favoritism between candidates vying for the same office," and determined that Colorado's asymmetric scheme violated the U.S. Constitution's requirement that citizens be treated equally under the law. *Id*. at 929, 930. Specifically, the Tenth Circuit determined that because "[a]fter the primary, a supporter of [the write-in candidate] could give" half as much money for the general election, "the statute treated contributors differently based on the political affiliation of the candidate being supported. And by treating the contributors differently, the statute impinged on the right to political expression." *Id*. at 927.

Plaintiffs challenge a statute that in operation causes a Fifth Amendment harm comparable to the one identified in *Riddle*. As in *Riddle*—where the contribution limit distinguished between two types of candidates—the primary/general election bifurcation works a similar effect. Colorado's statute created different contribution limits for those who ran in a primary election and those who did not. Likewise, the federal scheme does not distinguish between

those candidates who must face significant primary challengers and those who do not. While "on its face" this scheme does not appear discriminatory, the disparate impact in favor of contributors to candidates who do not face a primary challenge—and their supporters—is clear "political reality." *Buckley*, 424 U.S. at 31 n.33.

Thus, a "fundamental principle: [that] the State must govern impartially" is at risk. *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 (1979). Unless the government has a constitutionally sufficient justification for allowing some contributors to give $5,200 for the general election, while prohibiting others from doing the same, the bifurcated limit must fall as applied. At minimum, given the Supreme Court's lack of a ruling on this constitutionally sensitive question, Plaintiffs' due process question ought to be certified to the Court of Appeals.

**D.     Plaintiffs do not challenge the dollar amount of the individual contribution limit, so any deference traditionally afforded the legislature in that context is not relevant here.**

It bears repeating that Plaintiffs do not challenge the dollar amount of the individual contribution limit. Instead, they challenge its structure, and the effects of that structure on Plaintiffs and those similarly situated. It is true that courts lack "a scalpel to probe" legislative judgments setting the precise dollar amounts of contributions, and thus, generally defer to legislative determinations on that point. *Buckley v. Valeo,* 424 U.S. at 30. It is another matter entirely, however, to defer to

an artificial bifurcation that treats a particular class of contributors unfairly, or to defer to a contribution regime that is not tailored to the prevention of *quid pro quo* corruption. Such schemes violate, respectively, the Fifth and First Amendments.

For example, in upholding state the contribution limits at issue there, *Nixon v. Shrink Mo.* observed that "[w]hile *Buckley*'s evidentiary showing exemplifies a sufficient justification for contribution limits, it does not speak to what may be necessary as a minimum." 528 U.S. at 391. The Court further noted that "*Buckley* upheld contribution limits as constitutional...noting the Court's 'deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized.'" *Id*. at 393 n.5 (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 500 (1985)).

Nevertheless, *Nixon v. Shrink Mo.* clarified that, while it had found sufficient evidence to uphold the base limits at issue there, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Id.* at 391. This ratcheted scale is illuminating when it comes to scrutinizing the bifurcated limit. Indeed, *Nixon v. Shrink Mo.* considered whether a state's limit on contributions to candidates was too low.[7] In other words, that case involved the

---

[7] Missouri's contribution limit was, like the federal limit, calculated on a per-election basis. 528 U.S. at 382-83 (citation omitted). But it was the existence and dollar amount of the limit that was challenged there—not, as here, its bifurcation.

mere existence of contribution limits as such, and whether they were set at an appropriate level, neither of which were "novel" questions. On the other hand, the issue here—the bifurcation of a total contribution to a single candidate between the primary and general portions of an election cycle, as applied to contributors like the Plaintiffs—does not merely reflect Congress's judgment that there should be *some* contribution limit set at some amount. Rather, it regulates the *manner* in which such contribution must be given. This question *is* novel.

Moreover, any applicable legislative deference is not without limit. In *Randall v. Sorrell*, for example, the Supreme Court considered Vermont's limit on individual contributions during an entire election cycle. 548 U.S. at 249 (noting that Vermont law "sets its limits per election cycle, which includes both a primary and a general election"). To ensure the limit was closely drawn to a sufficiently important governmental interest, *Randall* applied a two part test, first determining whether the statute showed "danger signs" of putting challengers at a significant disadvantage, and second "review[ing] the record independently and carefully with an eye toward assessing the statute's tailoring [and]…proportionality." 548 U.S. at 249 (quotation marks and citation omitted). The Court there did *not* defer to the legislature, because it determined that the limit in question was "too low and too strict to survive First Amendment scrutiny." *Id.* at 248.

Here, Congress has conditioned the noncorrupting nature of a $5,200 general election contribution on the timing of the gift: at least half must be given before the primary election, even if only by a day, and even if the entire $5,200 is used for the general election. Conversely, the entire $5,200 may *not* be given *after* the primary election, even if only by a day, and even though the same $5,200 will be used for the same general election. The bifurcated limit allows supporters of candidates without primary challengers to contribute twice as much money for the general election. This is not simply an exercise in legislative discretion with respect to setting dollar amounts, which courts lack a "scalpel to probe." *Buckley*, 424 U.S. at 30; *Randall*, 548 U.S. at 247, 248. It *doubles* the scope of association that certain contributors enjoy, and does so as a matter of government design.

## CONCLUSION

For the forgoing reasons, Plaintiffs' constitutional questions were properly certified to the Court of Appeals, and should be recertified.

Respectfully submitted this 13th day of March, 2015,

/s/ Allen Dickerson
Allen Dickerson (D.C. Bar No. 1003781)
CENTER FOR COMPETITIVE POLITICS
124 S. West Street, Suite 201
Alexandria, VA 22314
Tel: (703) 894-6800
Fax: (703) 894-6811

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of March, 2015, I filed the foregoing

Plaintiff's Opening Brief Regarding Certification in the above-captioned action via

this Court's ECF system, causing notice to be served upon the following:

Kevin Deeley
Acting Associate General Counsel
kdeeley@fec.gov

Erin Chlopak
Acting Assistant General Counsel
echlopak@fec.gov

Benjamin R. Streeter, III
Attorney
bstreeter@fec.gov

Steve Hajjar
Attorney
shajjar@fec.gov

FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463
(202) 694-1650

*Counsel for Defendant*

/s/ Allen Dickerson
Allen Dickerson

*Counsel for Plaintiffs*