UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAURA HOLMES, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 14-1243 (RMC)<br>)<br>)<br>)<br>)<br>) |

## OPINION

Laura Holmes and Paul Jost challenge the constitutionality of a provision in the

Federal Election Campaign Act (FECA) that limits individual donors to contributing $2,600 per

election to candidates running for federal office.  Plaintiffs insist that they do not oppose the

*amount* of money that an individual may contribute to a candidate for an election ($2,600),

acknowledging that any such challenge would be foreclosed by *Buckley v. Valeo* and its progeny.

Instead, Plaintiffs argue that the central question, which has yet to be addressed by the Supreme

Court, is whether FECA's per-election contribution structure is unconstitutional under the First

and Fifth Amendments because it allegedly allows some contributors to give twice as much

money to some candidates for use in the general election while denying others that same right.

Specifically, Plaintiffs state that FECA's contribution restriction did not allow them to combine

their primary and general election contributions ($2,600 per election) in order to give $5,200 to

successful primary candidates for use in the 2014 general election.  Plaintiffs complain that

FECA's per-election limit unfairly benefits contributors supporting candidates who were

unopposed in their primary contests because those contributors could give $2,600 before the

primary, and the unopposed candidate could later use those funds during the general election

campaign (for a total of $5,200).  Conversely, Plaintiffs argue, the limit disadvantages

contributors who wish to support general election candidates who faced substantial opposition in

their primaries because those contributors could not give $5,200 for use in the general election.

"In an abundance of caution," this Court initially certified two constitutional

questions to the *en banc* United States Court of Appeals for the District of Columbia.  *See*

*Holmes v. FEC*, No. CV 14-1243 (RMC), 2014 WL 6190937, at *1 (D.D.C. Nov. 17, 2014)

(Certification Order) [Dkt. 19].  The Circuit, however, remanded the case at the request of the

Federal Election Commission (FEC) to enlarge the record for appellate review and to determine

whether any constitutional questions were appropriate for certification.  Plaintiffs filed a motion

for certification [Dkt. 25]; FEC opposed, seeking summary judgment [Dkt. 27].[1]  The parties

presented oral argument on March 31, 2015.

After full consideration of the entire record and all arguments, the Court finds that

Plaintiffs' challenge to FECA's temporal per-election restrictions on individual contributions to

federal candidates constitutes a veiled attack on the contribution limit set by Congress and

upheld by the Supreme Court as a legitimate means to combat corruption.  Because Plaintiffs'

claims rest on issues of settled law, the Court will deny Plaintiffs' motion for certification and

grant FEC's motion for summary judgment.

---

[1] FEC filed a "Brief Opposing Certification and In Support of Summary Judgment in Favor of
the Commission," in which it argues that the case should be dismissed as moot or, alternatively,
that summary judgment should be awarded to FEC.  *See* FEC Brief, Dkt. 27 at 2.  The Court
construes this as a motion for summary judgment.

# I.  BACKGROUND

## A.  District Court's Role as a Factfinder

The Court of Appeals for the District of Columbia Circuit remanded this case "in order to provide the parties an opportunity to develop, by expedited discovery or otherwise, the factual record necessary for en banc review of the plaintiffs' constitutional challenge."  Order [Dkt. 21].  The Circuit further ordered: "the district court shall complete the functions mandated by [52 U.S.C.] § 30110 and described in *Wagner v. FEC*, [717 F.3d 1007, 1009 (D.C. Cir. 2013)], including the development of a record for appellate review, by April 24, 2015.  The district court is to certify any constitutional question(s) by that date as well." *Id.*[2]  After a period of discovery, this Court ordered the parties to file briefs on the certification issue as well as proposed findings of fact.  *See* Order [Dkt. 24].

The Circuit granted FEC's motion for remand because, in the main, FEC sought a more fully developed record.  Accordingly, this Court has included the majority of FEC's proposed facts here with only slight modifications.  Indeed, this Court "is inclined to be overinclusive rather than underinclusive when presented with close evidentiary disputes, preferring to convey as detailed a record as possible to the reviewing court."  *Cao v. FEC*, 688 F. Supp. 2d 498, 504 (E.D. La.), *aff'd sub nom In re Cao*, 619 F.3d 410 (5th Cir. 2010)); *see also* Charles Wright and Arthur Miller, 9A Fed. Prac. & Proc. Civ. § 2411 (3d ed.) ("[I]n a nonjury case the court should be slow to exclude evidence challenged under one of the exclusionary rules.").

---

[2] *Wagner* provides that, first, a district court "must develop a record for appellate review by making findings of fact.  Second, the district court must determine whether the constitutional challenges are frivolous or involve settled legal questions.  Finally, the district court must immediately certify the record and all non-frivolous constitutional questions to the en banc court of appeals."  *Wagner*, 717 F.3d at 1009.

**B.   Objections**

Both parties have raised numerous objections to their opponents' proposed findings of facts.  Plaintiffs chiefly object to the relevance of many of FEC's proposed facts.  Pl. Objections [Dkt. 38-3] at 3.  Plaintiffs also argue that FEC's "findings of fact contain[ ] conclusory and argumentative phrases that are both irrelevant and inappropriate for certification," *id.* at 3 n.3, and that certain proposed facts are derived from inadmissible hearsay or improper expert opinion, *see, e.g.*, *id.* at 7.  FEC argues that Plaintiffs' facts are "incomplete, inaccurate, or misleading."  FEC Responses [Dkt. 30] at 2.

This Court has considered all of the above objections in entering its Factual Findings and overrules most of Plaintiffs' relevance objections.  *See Cao*, 688 F. Supp. 2d at 505 ("To the extent proposed facts that are tangential to the instant litigation nonetheless provide useful context for overall campaign finance regulation scheme, the above objections have been overruled.  However, to the extent those proposed facts obscure the most relevant issues being put before the appellate court, those objections have been sustained.").  The Court also overrules most of Plaintiffs' admissibility objections because the facts to which they object are legislative facts, which are "general facts which help the tribunal decide questions of law and policy, are without reference to specific parties, and need not be developed through evidentiary hearings." *Libertarian Nat'l Comm., Inc. v. FEC* (*LNC*), 930 F. Supp. 2d 154, 157 (D.D.C. 2013) (internal citations and quotations omitted).  This Court has omitted or modified any proposed finding of fact that was argumentative or drew legal conclusions.

### C.  Factual Findings

**The Parties**

1.      Plaintiffs Laura Holmes and Paul Jost are a married couple, residing in Miami, Florida.  Compl. ¶ 8; Declaration of Joyce Sadio (Sadio Decl.), Ex. 1 (Holmes Interrog. Resp.) ¶ 8; *id.*, Ex. 2 (Jost Interrog. Resp.) ¶ 8.  Plaintiffs are citizens of the United States.  Compl. ¶ 8; Holmes Decl. ¶ 3 [Dkt. 6-2] ¶ 3; Jost Decl. [Dkt. 6-3] ¶ 3.  Plaintiffs were eligible to vote in the 2012 presidential election.  Compl. ¶ 8; Holmes Decl. ¶ 5; Jost Decl. ¶ 5.  Plaintiff Laura Holmes sometimes uses the name "Laura Holmes-Jost" when contributing to candidates.  Compl. ¶ 8.

2.      Defendant Federal Election Commission (FEC) is an independent agency of the United States that administers, interprets, and civilly enforces the Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30101-30146 (formerly 2 U.S.C. §§ 431-57),[3] and other statutes.  FEC is empowered to formulate policy with respect to FECA, *id.* § 30106(b)(1) (§ 437c(b)(1)); to make, amend, and repeal such rules and regulations necessary to carry out FECA, *id.* §§ 30107(a)(8), 30111(a)(8), 30111(d); and to enforce civilly FECA and the Commission's regulations, *id.* §§ 30106(b)(1), 30109(a)(6).

**Regulatory Framework: Statutory Contribution Limits**

3.      Congress has been setting campaign contribution limits for nearly seventy-five years.  In 1939, Senator Carl Hatch introduced, and Congress passed, S. 1871, officially titled "An Act to Prevent Pernicious Political Activities" and commonly

---

[3] Effective September 1, 2014, the provisions of FECA codified at 2 U.S.C. §§ 431-57 were recodified and transferred to 52 U.S.C. §§ 30101-30146.  This Opinion will refer to the recodified provisions when citing to FECA.

referred to as the Hatch Act. S. Rep. No. 101-165, at *18 (1939); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 560 (1973); 84 Cong. Rec. 9597-9600 (1939).  Congress established individual contribution limits in the 1940 amendments to the Hatch Act, Pub. L. No. 76-753, 54 Stat. 767 (1940). That legislation prohibited "any person, directly or indirectly" from making "contributions in an aggregate amount in excess of $5,000, during any calendar year" to any candidate for federal office.  *Id.* § 13(a), 54 Stat. 770.

4.     By 1971, when Congress began debating the initial enactment of FECA, the Hatch Act's $5,000 per-calendar-year individual contribution limit was being "routinely circumvented." 117 Cong. Rec. 43,410 (1971) (statement of Rep. Abzug).

5.     A 1974 congressional report identified multiple instances of such circumvention. For example, the dairy industry had avoided then-existing reporting requirements by dividing a $2,000,000 contribution to President Nixon among hundreds of committees in different States, "which could then hold the money for the President's reelection campaign." Final Report of the Select Committee on Presidential Campaign Activities, S. Rep. No. 981, 93d Cong., 2d Sess. 615 (1974) ("*Final Report*").  On another occasion, a presidential aide promised an ambassadorship to a particular individual in return for "a $100,000 contribution, which was to be split between 1970 Republican senatorial candidates designated by the White House and [President] Nixon's 1972 campaign." *Final Report* at 492.  That arrangement was not unique.  *Id.* at 501 (describing a similar arrangement with someone else); *see id.* at 493-94 (listing substantial

contributions by ambassadorial appointees); *see also* David W. Adamany &

George E. Agree, *Political Money: A Strategy for Campaign Financing in*

*America* 39-41 (1975) (collecting instances of large contributors "giving and

getting"); Herbert E. Alexander, *Financing Politics: Money, Elections and*

*Political Reform* 124-26 (1976) (describing contributions that gave the

appearance of quid pro quo corruption and may have raised "suspicio[ns] about

. . . large campaign gifts").

6.     The 1974 FECA Amendments that were enacted shortly after the Watergate

scandal included tighter limits on the amounts that individuals, political parties,

and political committees could contribute to candidates.  In particular, Congress

established a $1,000 per-candidate, per-election limit on individual contributions

to candidates and their authorized political committees.  FECA Amendments of

1974, Pub. L. No. 93-443, § 101(b)(3), 88 Stat. 1263 (first codified at 18 U.S.C.

§ 608(b)(3)).

7.     FECA's contribution limits apply both to direct contributions of money and to in-

kind contributions of goods or services. 52 U.S.C. § 30101(8)(A).

8.     The individual contribution limits apply on a per-candidate, per-election basis,

with "election" defined to include each of the following: (A) a general, special,

primary, or runoff election; (B) a convention or caucus of a political party which

has authority to nominate a candidate; (C) a primary election held for the

selection of delegates to a national nominating convention of a political party; and

(D) a primary election held for the expression of a preference for the nomination

of individuals for election to the office of President.  52 U.S.C. § 30101(1).  The

individual contribution limits apply separately with respect to each election,
except that all elections held in any calendar year for the office of President of the
United States (except a general election for such office) are considered to be one
election.  52 U.S.C. §§ 30116(a)(1)(A); 30116(a)(6).

9.  The Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81
(BCRA), amended FECA to raise the individual per-candidate, per-election
contribution limit and index it for inflation.  *See* BCRA § 307(b), 116 Stat. 102-
103 (codified at 52 U.S.C. § 30116(a)(3) (2 U.S.C. § 441a(a)(3)); BCRA
§ 307(d), 116 Stat. 103 (codified at 52 U.S.C. § 30116(c) (2 U.S.C. § 441a(c)(1)).

10.  The limit that applied to individual contributions made to federal candidates
during the 2013-2014 election cycle, including the contributions at issue in this
case, was $2,600 per candidate, per election.  FEC, *Price Index Adjustments for
Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure
Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013).  The FEC recently raised the
limit for the 2015-2016 election cycle to $2,700 per-candidate, per-election.  FEC,
*Price Index Adjustments for Contribution and Expenditure Limitations and
Lobbyist Bundling Disclosure Threshold*, 80 Fed. Reg. 5750, 5751 (Feb. 3, 2015).

11.  Because FECA defines "election" to include various types of electoral contests,
the total amount that an individual may contribute to a particular candidate during
a particular election cycle depends on the number of elections in which that
candidate participates to pursue the federal office being sought.  This means that
an individual who supported a candidate who participated in one primary election
and one general election during the 2013-2014 election cycle was permitted to

8

contribute a total of $5,200 to that candidate—$2,600 for the candidate's primary-election campaign and $2,600 for the candidate's general-election campaign. *See* 52 U.S.C. § 30116(a); FEC Price Index Adjustments, 78 Fed. Reg. at 8532. *Holmes v. FEC*, No. CV 14-1243 (RMC), 2014 WL 6190937, at *2 (D.D.C. Nov. 17, 2014) (Certification Order) [Dkt. 19].

12.     In an election cycle in which a candidate competes in one or more runoffs, special elections, or a political party caucus or convention, in addition to a primary and general election, the total amount that an individual may contribute to that candidate is higher. 52 U.S.C. §§ 30101(1), 30116(a)(1)(A) (2 U.S.C. §§ 431(1), 441a(a)(1)(A)); Certification Order at *2.

**<u>Plaintiffs' Experience with FECA's Maximum Per-Election Contribution Limits</u>**

13.     For instance, Plaintiffs contributed to Congressman Marshall "Mark" Sanford's campaigns during the 2013-2014 election cycle. Sadio Decl., Ex. 1 ¶ 5; *id.*, Ex. 2 ¶ 5.

14.     In 2013-14, Sanford successfully pursued the congressional seat vacated by Representative Tim Scott, who had served as the United States Representative for the 1st Congressional District of South Carolina until he was appointed to the United States Senate. *Id.*, Ex. 23; Declaration of Eileen Leamon (Leamon Decl.), Ex. 2 at 95-97, 123-24.

15.     Between March and November 2013, plaintiff Laura Holmes contributed the maximum permissible $2,600 to Sanford for each of the following three elections: (1) the special-runoff election against Curtis Bostic for appearance on the ballot of the special-general election to fill the seat vacated by Representative Scott; (2) the

special-general election against Elizabeth Colbert Busch to fill the seat vacated by Representative Scott; and (3) Congressman Sanford's primary election, in which Sanford competed as an unopposed incumbent.  Sadio Decl., Ex. 1 ¶ 5; Leamon Decl., Ex. 2 at 95-97, 123-24.

16.     Plaintiff Paul Jost contributed the exact same amounts during the same time period to the Sanford campaign committee in connection with each of those three elections. Sadio Decl., Ex. 2 ¶ 5.

## Primary and General Elections

17.     Primary elections serve the purpose of determining, in accordance with State law, which candidates are "nominated . . . for election to Federal office in a subsequent election." 11 C.F.R. § 100.2(c)(1) (defining "primary election").

18.     General elections are those held to "fill a vacancy in a Federal office (*i.e.*, a special election) and which [are] intended to result in the final selection of [] single individual[s] to the office at stake." 11 C.F.R. § 100.2(b)(2) (defining "general election").

19.     Nearly all fifty states use some type of primary elections in their procedures for electing individuals to serve in federal office.  Eleven states use "open" primaries, in which any registered voter may vote.  Eleven states use "closed" primaries, in which only voters previously registered as members of a political party may participate in the nomination process of their party.  Two states use a "top two" primary model.  *See infra* ¶ 36.  Twenty-four states use some "hybrid" primary model, falling somewhere between the "open" and "closed" primary types.  Sadio Decl., Ex. 15; *id.*, Ex. 4 at 1-2.

**FEC Implementing Regulations**

20.     FEC regulations "encourage[]" contributors to designate in writing the particular

election for which an individual contribution is intended.  11 C.F.R.

§ 110.1(b)(2)(i); Certification Order at *2.

21.     Undesignated contributions count against the donor's contribution limits for the

candidate's next election; designated contributions count against the donor's

contribution limits for the named election.  11 C.F.R. § 110.1(b)(2)(ii);

Certification Order at *2.

22.     When a candidate has net debts outstanding from a past election—including a

primary election—a contributor may designate a contribution in writing for that

past election. Such contributions may only be accepted for the purpose of retiring

debt and only up to the extent of the debt.  11 C.F.R. §§ 110.1(b)(3)(i),

(b)(5)(i)(B); Certification Order at *2.

23.     If a candidate's net outstanding debts from a past election amount to less than the

amount of a contribution designated for a previous election, Commission

regulations permit the candidate (or his committee) to refund the contribution,

redesignate it (with the donor's written authorization) for a subsequent election, or

reattribute the contribution as from a different person if it was intended to be a

joint contribution. 11 C.F.R. §§ 110.1(b)(3)(i)(A) & (C); 110.1(k)(3).

24.     A primary contribution that is redesignated for use in a candidate's general

election counts against the contributor's general-election limit.  11 C.F.R.

§ 110.1(b)(5)(iii) ("A contribution  redesignated for another election shall not

exceed the limitations on contributions made with respect to that election.").

25.     If a primary candidate fails to qualify for the general election, then all general-
        election contributions received by that candidate must similarly be returned or
        redesignated or reattributed for a different election.  11. C.F.R.
        § 110.1(b)(3)(i)(C).

26.     In addition, FEC regulations permit any candidate participating in a general
        election who has remaining, unused primary contributions to transfer such unused
        primary contributions to pay for the candidate's general-election expenses.  11
        C.F.R. § 110.3(c)(3) (stating that "contribution limitations . . . shall not limit . . .
        [t]ransfers of funds between the primary campaign and general election campaign
        of a candidate of funds unused for the primary").

27.     General-election candidates are also permitted to use general-election
        contributions to pay outstanding primary-election debts.  11. C.F.R.
        § 110.1(b)(3)(iv).  Candidates need not obtain contributor authorization to make
        such payments from their primary, general, and any other election accounts, and
        such payments by candidates do not change the per-election contribution limits
        for individual contributors.  11 C.F.R. §§ 110.1(b)(3)(iv), 110.3(c)(3); Sadio
        Decl., Ex. 3 (FEC Campaign Guide for Congressional Candidates and
        Committees) at 21.

28.     An individual contribution is considered to have been "made when the contributor
        relinquishes control over the contribution." 11 C.F.R. § 110.1(b)(6).  Generally, a
        recipient candidate and her campaign may spend contributions to the campaign
        however the campaign chooses.  Thus, the money can be spent on the candidate's
        next election campaign, transferred to a different political committee (within any

applicable contribution limits), or used for any "other lawful purpose unless prohibited."  52 U.S.C. § 30114(a).

29.     Past FEC interpretations illustrate the constraints that are placed on committees with respect to primary- and general-election financing.  *See infra* ¶¶ 30-34.

30.     In Advisory Opinion 1986-17, FEC approved a request on behalf of a candidate to use individual contributions for the general election prior to the date of the primary election where the requestor had pledged to account separately for such general election contributions and to refund all such contributions if the candidate lost the primary election and thus would not participate in the general election. *See* Sadio Decl., Ex. 5.  FEC found that FECA permits a committee to spend general-election contributions "prior to the primary election" where such expenditures are "exclusively for the purpose of influencing the prospective general election" and "it is necessary to make advance payments or deposits to vendors for services that will be rendered" after the candidate's general-election candidacy has been established.  *Id.* at 4.  FEC further explained that all general-election contributions must be refunded if the candidate does not qualify for the general election.  *Id.*

31.     More recently, in Advisory Opinion 2009-15, FEC responded to a series of questions regarding the designation, use, reattribution, redesignation, and potential refund of individual contributions made to an authorized committee of a candidate who intended to run for a Senate seat that was expected to be vacant in the next election cycle, but that might become vacant more immediately upon the anticipated resignation of the incumbent.  *See* Sadio Decl., Ex. 6.  Under the

circumstances, any midterm vacancy would have been filled by a special election and, if necessary, a special run-off election. *Id.* at 1-2. In rendering a decision, FEC explained that the committee could accept contributions for the anticipated special election and special runoff election, but "must use an acceptable accounting method to distinguish between the contributions received for each of the two elections, *e.g.*, by designating separate bank accounts for each election or maintaining separate books and records for each election." *Id.* at 5 (citing 11 C.F.R. § 102.9(e)(1)). FEC further advised the committee that it "must not spend funds designated for the runoff election unless [the candidate] participates in the runoff." *Id.* at 5 n.6 (citing 11 C.F.R. § 102.9(e)(3)).

32.     FEC has also pursued enforcement actions in instances where primary-election candidates violated the rules requiring candidates who fail to qualify for a general election to refund (or redesignate or reattribute) any general-election contributions they have received. *See infra* ¶¶ 33-34 and Exhibits cited therein.

33.     In *In the Matter of Jim Treffinger for Senate, Inc.*, Matter Under Review 5388, FEC, in April 2006, entered into a conciliation agreement with the "Treffinger for Senate" committee and its treasurer to resolve their violations of FECA and FEC regulations based on their failure to refund, reattribute, or redesignate nearly all of the candidate's more than $200,000 in general-election contributions despite his loss of the primary election. Sadio Decl., Ex. 7 at 4. The committee and treasurer admitted the violations and agreed to pay a civil penalty of $57,000. *Id.* at 5.

34.     In *In re Wynn for Congress*, FEC in 2010 entered into a conciliation agreement with the Wynn for Congress committee and its treasurer to resolve their violations

of FECA and FEC regulations based on, *inter alia*, their failure to employ an

accounting method to distinguish between primary and general-election

contributions and their failure to refund the excessive contributions within sixty

days of the candidate's primary-election loss.  Sadio Decl., Ex. 8 at 2-4.  The

Committee admitted to the violations and agreed to pay a civil penalty of

$8,000.00.  *Id.* at 4.

**Variations in State Election Procedures**

35.     FECA's separate contribution limits for each election within a particular election

cycle account for the lack of uniformity in federal electoral contests—including

the races within different political parties for the same particular office.  *See infra*

¶ 36.

36.     California—the State in which plaintiff Paul Jost's preferred candidate sought

election—and Washington each hold "top two" primary elections in which all

candidates, regardless of their party, compete against one another.  Ballots in both

States may include the candidates' party affiliation.  In both California and

Washington, a candidate who lacks an intraparty primary challenger may still fail

to proceed to the general election because all candidates for a particular office are

listed on the same primary ballot and the two candidates who receive the greatest

number of votes, regardless of party preference, then compete in the general

election.  Sadio Decl., Exs. 9, 17; *see* Certification Order at *2 (describing top

two system in California).

37.     Louisiana follows a unique electoral procedure in which no congressional primary

election is held at all.  Sadio Decl., Ex. 4 at 2 n.8.  Only where a candidate fails to

win a majority of the vote does the State hold a second election, termed a "runoff," in December of the same year. *Id.*; *see* Leamon Decl., Ex. 1 at 31 (identifying results of Louisiana congressional electoral contests featuring only a November election and others featuring a second election in December of the same year).

38.     In 2014, the first election for candidates seeking federal office in Louisiana was the general election held on November 4, 2014.  Because no candidate won a majority of the vote in Louisiana's November 2014 election for U.S. Senate, the State held a second election, a runoff, on December 6, 2014.  Sadio Decl., Exs. 18-19.  In the December election, incumbent Democrat Senator Mary Landrieu lost her seat to a challenger, Republican and former Representative Bill Cassidy. *Id.*, Ex. 19.

39.     Between 2008 and 2010, Louisiana followed a different procedure that included regular primary and general elections, as well as runoff elections in instances where no candidate received a majority of the vote in the primary or general contest.  *See, e.g.*, Leamon Decl., Ex. 1 at 55, 71.

40.     Ten states—Alabama, Arkansas, Georgia, Iowa, Mississippi, North Carolina, Oklahoma, South Carolina, South Dakota, and Texas—currently provide for post-primary runoff elections or conventions in federal electoral contests under varying circumstances.  Sadio Decl., Ex. 4 at 1-2.

41.     In the event of post-primary runoff elections or conventions, candidates may receive additional contributions, up to the applicable per-election limit, for their runoff election campaigns.  52 U.S.C. § 30101(1) (2 U.S.C. § 431(1)).

42. Over the course of the last six election cycles, from the 2003-2004 cycle through the 2013-2014 cycle, 95 congressional races have included a primary runoff contest in at least one of the party primaries, averaging more than fifteen primary runoff elections per cycle. *See infra* ¶¶ 43-51.

43. During the 2013-2014 election cycle, fifteen congressional races in seven states included at least one primary runoff contest after the party primaries. Leamon Decl., Ex. 1 at 1-24.

44. In one primary runoff, six-term incumbent Mississippi Senator Thad Cochran failed to receive enough votes in the Mississippi Republican Senate primary election to avoid having to compete in an additional election against his primary opponent, Chris McDaniel, before proceeding to the general election. *Id.* at 10, 12. In the Mississippi Democratic Senate primary, by contrast, Travis Childers won his contest by a sufficient margin to avoid having to participate in a runoff. *Id.* at 10.

45. In the 2014 primary election for Iowa's Third Congressional District, no Republican primary candidate attained the 35 percent of the vote required under Iowa law to win the primary election. *Id.* at 8. The primary election was thus deemed "inconclusive" and the candidates were selected by a political party convention, IA Code § 43.52, for which a separate contribution limit applied, 52 U.S.C. § 30101(1)(B) (2 U.S.C. § 431(1)(B)). *Id.* at 7-8; Sadio Decl., Ex. 22.

46. During the 2011-2012 election cycle, 21 congressional races in seven states included at least one primary runoff contest after the party primaries. Leamon Decl., Ex. 1 at 25-42.

47.  During the 2009-2010 election cycle, 29 congressional races in nine states included at least one primary runoff contest after the party primaries.  *Id.* at 43-66.

48.  During the 2007-2008 election cycle, ten congressional races in six states included at least one primary runoff contest after the party primaries.  *Id.* at 67-75.

49.  During the 2005-2006 election cycle, eight congressional races in five states included at least one primary runoff contest after the party primaries.  *Id.* at 76-89.

50.  During the 2003-2004 election cycle, twelve congressional races in five states included at least one primary runoff contest after the party primaries.  *Id.* at 90-102.

51.  FECA's separate contribution limits for each election within a particular election cycle also account for the occurrence of special elections—including special primary elections, special runoff elections, and special general elections — which are held, in accordance with state-specific procedures, in various special circumstances including when necessary to fill a seat vacated by an incumbent who left office before completing his or her full term.

52.  Over the course of the last six election cycles, from the 2003-2004 cycle through the 2013-2014 cycle, there have been 126 special elections, averaging more than 21 per cycle.  *See infra* ¶¶ 53-58.

53.  During the 2013-2014 election cycle, twelve states held a total of 33 special elections—including special primary elections, special runoff elections, and special general elections—to fill fourteen separate federal offices in those states.  Leamon Decl., Ex. 2 at 93-126.

54.  During the 2011-2012 election cycle, nine states held a total of seventeen special

elections—including special primary elections, special runoff elections, special general elections, and special party caucuses—to fill ten separate federal offices in those states. Leamon Decl., Ex. 2 at 76-92.

55. During the 2009-2010 election cycle, eleven states held a total of 25 special elections—including special primary elections, special runoff elections, and special general elections—to fill sixteen separate federal offices in those states. *Id.* at 50-75.

56. During the 2007-2008 election cycle, eleven states held a total of 27 special elections—including special primary elections, special runoff elections, and special general elections—to fill fifteen separate federal offices in those states. *Id.* at 23-49.

57. During the 2005-2006 election cycle, four states held a total of eighteen special elections—including special primary elections, special runoff elections, and special general elections—to fill thirteen separate federal offices in those states. *Id.* at 8-22.

58. During the 2003-2004 election cycle, five states held a total of six special elections—including special primary elections, special runoff elections, and special general elections—to fill five separate federal offices in those states. *Id.* at 1-7.

59. When candidates do not face an opponent listed on primary or general-election ballots, they are still subject to challenge in most states by potential write-in candidates. *See, e.g.*, Sadio Decl., Ex. 16 (describing varying procedures for write-in candidates).

60.     Write-in contenders have won at least seven U.S. Congressional races and two

U.S. Senate races.  *See, e.g.*, Sadio Decl., Ex. 16 (describing seven U.S.

Congressional races and Strom Thurmond's U.S. Senate victory); *id.* Ex. 26 (State

of Alaska's official results showing plurality of write-in votes); *id.* Ex. 27

(describing Alaska Senator Lisa Murkowski's write-in victory).

**Facts of Plaintiffs' Case**

61.     In 2014, Ms. Holmes supported Carl DeMaio, a Republican candidate for

California's 52nd Congressional District (CA-52).  Compl. ¶ 19.

62.     Ms. Holmes chose not to make any contributions to Mr. DeMaio for the primary

election.  *Id.* ¶ 21; Sadio Decl. Ex. 1 ¶ 2.

63.     There were four candidates on the ballot to represent CA-52:  Scott Peters, a

Democrat and the incumbent; Carl DeMaio, a Republican; Kirk Jorgensen, a

Republican; and Fred J. Simon, Jr., a Republican.  California Secretary of State,

Statement of Vote, June 3, 2014, Statewide Direct Primary Election at 24,

available at http://elections.cdn.sos.ca.gov/sov/2014-primary/pdf/2014-complete-

sov.pdf (last visited April 1, 2015).

64.     Mr. DeMaio finished second in California's June 3, 2014 "top two" congressional

primary election behind incumbent Scott Peters, a Democrat.  Compl. ¶¶ 19-20;

*see* Sadio Decl. Ex. 10 at 76.

65.     Under California's "top two" primary system, Congressman Peters and Mr.

DeMaio opposed each other again in the general election.  Sadio Decl., Exs. 10-

11; *see also id.* Ex. 1 ¶ 3.

66.     Scott Peters competed directly against three candidates in the 2014 California

congressional primary election; Mr. Peters was the sole Democratic candidate in that contest.  Sadio Decl. Ex. 10; *see also id.*, Ex. 1 ¶ 3.

67.     Ms. Holmes contributed $2,600 to Mr. DeMaio's campaign committee for his general-election campaign on or about July 21, 2015.  Compl. ¶ 21; Sadio Decl., Ex. 1 ¶ 1).

68.     Ms. Holmes wanted to contribute an additional $2,600 to Mr. DeMaio for his general-election campaign but did not do so because that contribution would have exceeded the $2,600 per-election contribution limit established by FECA for individual contributions to candidates during the 2013-2014 election cycle. Compl. ¶ 21; *see* FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013).

69.     In the November 4, 2014 general election, Congressman Scott Peters won reelection to represent CA-52 in the United States House of Representatives, defeating Carl DeMaio.  Sadio Decl., Ex. 11 at 8.

70.     In 2014, Mr. Jost supported Marianette Miller-Meeks, a Republican candidate for Iowa's Second Congressional District.  Compl. ¶¶ 22-24.

71.     Mr. Jost chose not to make any contributions to Dr. Miller-Meeks for the primary election, in which she faced two other Republican candidates, Mark Lofgren and Matthew Waldren.  Compl. ¶ 24; Sadio Decl., Ex. 2 ¶ 1; Iowa Secretary of State, 2014 Primary Election Results, Official Canvass by County at 10, available at https://sos.iowa.gov/elections/pdf/2014/primary/canvsummary.pdf (last visited April 1, 2015).

72.     Dr. Miller-Meeks won her primary election on June 3, 2014.  Sadio Decl., Ex. 21;

        Leamon Decl., Ex. 1 at 8.

73.     In the general election, Dr. Miller-Meeks faced incumbent Congressman David

        Loebsack, who had been the only candidate on the ballot in the June 3, 2014

        Democratic Party primary for Iowa's Second Congressional District.  Sadio Decl.,

        Ex. 20; Compl. ¶¶ 19-20.

74.     Mr. Jost contributed $2,600 to Dr. Miller-Meeks's campaign committee for her

        general-election campaign in July 2014.  Compl. ¶ 24.

75.     Mr. Jost wanted to contribute an additional $2,600 to Dr. Miller-Meeks for her

        general-election campaign but did not do so because that contribution would have

        exceeded FECA's $2,600 per-election contribution limit for individual

        contributions to candidates during the 2013-2014 election cycle.  Compl. ¶ 24; *see*

        FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and*

        *Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013).

76.     In the November 4, 2014 general election, Congressman Loebsack won reelection

        to represent Iowa's 2nd Congressional District in the United States House of

        Representatives, defeating Dr. Miller-Meeks.  Sadio Decl., Ex. 20.

**D.  Plaintiffs' Arguments**

        Plaintiffs argue that FECA's per-election contribution limit violates the First and

Fifth Amendments, as applied to them, by limiting the amounts Ms. Holmes and Mr. Jost can

lawfully contribute to the general election campaigns of their preferred candidates to $2,600, and

preventing them from contributing $5,200.  Plaintiffs do not seek to contribute to their respective

candidates in the primary elections, and do not claim a right to contribute both $2,600 in the

primary election and $5,200 in the general election.  Rather, Plaintiffs challenge FECA's

separate $2,600 per-election limit.  Plaintiffs' challenge "is not based on an incumbent/

challenger distinction, but rather on the asymmetry posed whenever a candidate who faces a

primary challenge competes in the general election against a candidate who ran virtually

unopposed during the primary."  Sadio Decl., Ex. 1 (Holmes RFA Responses) ¶ 4; *id.*, Ex. 2

(Jost RFA Responses) ¶ 3.[4]

### E.  Procedural Background

Plaintiffs filed suit on July 21, 2014, alleging that FECA's contribution limit of

$2,600 per-individual/per-candidate/per-election is unconstitutional as applied to them, where

Plaintiffs wanted to contribute no money to any primary candidate and instead contribute $5,200

to their preferred general-election candidates—the candidates who won their party primaries.

Plaintiffs sought a declaratory judgment and injunction barring enforcement against them of

FECA's per-election individual contribution limit.  On August 20, 2014, Plaintiffs filed a motion

for a preliminary injunction.  *See* Mot. for Prelim. Inj. [Dkt. 6].  After full briefing, this Court

denied the motion for a preliminary injunction on October 20, 2014.  *See* Order [Dkt 16].

---

[4] FEC proposes facts relating to Plaintiffs' assertion that a constitutional violation occurs where
the recipient candidate's opponent does not face a "substantial primary opponent."  Compl. ¶ 66.
In their Responses to FEC's Requests for Admission, Plaintiffs defined "substantial primary
opponent" as "[a] candidate for office who is a member of the same political party as his or her
opponent, must compete in the same primary election, and is sufficiently likely to succeed that
his or her candidacy would materially alter the competitive position of a candidate similarly
situated to Scott Peters during the 2014 primary."  Sadio Decl., Ex. 1 ¶ 2; *id.* Ex. 2 ¶ 2
(substituting "David Loebsack" for "Scott Peters")).  FEC states that neither FECA nor FEC's
regulations define or use the phrase "substantial primary opponent" or involve any inquiry
regarding whether a candidate is "sufficiently likely to succeed" such that "his or her candidacy
would materially alter the competitive position" of another candidate, including one "similarly
situated" to Congressmen Peters or Loebsack in their 2014 primary elections.  FEC also asserts
that there is currently no context in which it evaluates the substantiality of congressional
candidates (either on the ballots or write-ins) or forecasts their election prospects.  FEC Proposed
Findings of Fact ¶ 83.  The Court does not find any of these proposed facts relevant.

On November 17, 2014, the Court certified two constitutional questions to the

United States Court of Appeals for the District of Columbia Circuit for en banc consideration.

*See* Memorandum and Findings [Dkt. 19]; Certification Order at *3.  On January 30, 2015, the

United States Court of Appeals for the District of Columbia Circuit granted FEC's Motion to

Remand.  The Circuit ordered:

> The court grants the motion to remand this 52 U.S.C. § 30110 (formerly 2 U.S.C. § 437h) case in order to provide the parties an opportunity to develop, by expedited discovery or otherwise, the factual record necessary for en banc review of the plaintiffs' constitutional challenge.  *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981); *Wagner v. FEC*, 717 F.3d 1007, 1009 (D.C. Cir. 2013).

Order Granting Motion for Remand [Dkt. 21].  It further ordered:

> that the district court shall complete the functions mandated by § 30110 and described in *Wagner v. FEC*, 717 F.3d at 1009, including the development of a record for appellate review, by April 24, 2015.  The district court is to certify any constitutional question(s) by that date as well.

*Id.*  The "functions" described in *Wagner* are as follows:

> First, [the district court] must develop a record for appellate review by making findings of fact.   Second, the district court must determine whether the constitutional challenges are frivolous or involve settled legal questions.   Finally, the district court must immediately certify the record and all non-frivolous constitutional questions to the en banc court of appeals.

*Wagner*, 717 F.3d at 1009 (citations omitted).

## II. JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiffs' challenges under First and Fifth

Amendments to the United States Constitution pursuant to 28 U.S.C. § 1331.  However, a district

court's jurisdiction is limited by FECA, which states that a "district court immediately shall

certify all questions of constitutionality of this Act to the United States court of appeals for the

circuit involved, which shall hear the matter sitting en banc." 52 U.S.C. § 30110. Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (e).

FEC argues that jurisdiction is wanting because this case is moot. FEC is incorrect. The Supreme Court set forth the standard for mootness in *FEC v. Wisconsin Right To Life, Inc.*, a case that involved challenges to the Bipartisan Campaign Reform Act's (BCRA) ban of corporate advertisements prior to the 2004 election. *FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007). Despite the fact that the election had already occurred, the Supreme Court held that it "fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *Id.* at 462. This mootness exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (internal quotation omitted). With respect to the first factor, the Supreme Court explained that BCRA's expedited review procedure often was insufficient to allow a plaintiff to obtain complete judicial review in advance of an election. *Id.*; *see also Davis v. FEC*, 554 U.S. 724, 735 (2008) (finding that plaintiff's case was capable of evading review because case preceded 2004 general election season but could not be resolved before the 2006 election concluded).

As for the second factor, the Supreme Court found:

> The second prong of the capable of repetition exception requires a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party. Our cases find the same controversy sufficiently likely to recur when a party has a reasonable expectation that it will again be subjected to the alleged illegality, or will be subject to the threat of prosecution under the challenged law . . . .

*Wisconsin Right to Life, Inc.*, 551 U.S. at 463 (internal quotations omitted).  The Court further

noted:

> We have recognized that the capable of repetition, yet evading review doctrine, in the context of election cases, is appropriate when there are "as applied" challenges as well as in the more typical case involving only facial attacks.  Requiring repetition of every "legally relevant" characteristic of an as-applied challenge—down to the last detail—would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges.  History repeats itself, but not at the level of specificity demanded by the FEC.

*Id.* (internal quotations omitted).

Plaintiffs' case easily satisfies this two-pronged exception to the mootness

doctrine.  Election controversies like this one "are paradigmatic examples of cases that cannot be

fully litigated before the particular controversy expires."  *Moore v. Hosemann*, 591 F.3d 741,

744 (5th Cir. 2009).  Indeed, Plaintiffs brought this case in July of 2014, challenging FECA's

applicability in the 2014 general election, and do not yet have determination on the merits;

clearly, relief could not have been granted in the time it will take to litigate this action.

As for the second prong, there is a reasonable expectation that Plaintiffs will again

be subject to FECA's per-election contribution limit.  Regardless of whether they will seek to

donate in the 2016 election to the exact same candidates, such specific repetition is not required.

Plaintiffs note that they have a long history of contributing to their preferred candidates,

including supporting those candidates only in their general elections.  Pl. Reply [Dkt. 28] at 6.

Plaintiffs also aver that they intend to make such contributions in the future.  *Id.* at 5-6; *see*

*Unity08 v. FEC*, 596 F.3d 861, 864 (D.C. Cir. 2010) (finding case was not moot where plaintiff

filed "a sworn declaration unambiguously stating a conditional intent to resume activities in a

future election cycle if the group wins its lawsuit against the Commission").  Therefore, there is

more than a "reasonable expectation" here that FECA will bar Plaintiffs from contributing as they desire in the future and that they will be subjected to the same restriction. *See Davis*, 554 U.S. at 736 (plaintiff's claim was capable of repetition because he made a public statement expressing intent to self-finance another bid for a House seat); *Branch v. FCC*, 824 F.2d 37, 41 (D.C. Cir. 1987) (finding case not moot "even though the 1984 town council election has long passed, since [plaintiff] seeks to preserve his right to run in a future election by preventing a recurrence of these events" and noting that "[c]ontroversies that arise in election campaigns are unquestionably among those saved from mootness under the exception for matters 'capable of repetition, yet evading review'") (quoting *Moore v. Ogilvie,* 394 U.S. 814, 816 (1969)); *Herron for Cong. v. FEC*, 903 F. Supp. 2d 9, 14-15 (D.D.C. 2012) (requirement of being subjected to same action is "easily met" when challenging electoral regulation).

FEC contends that Plaintiffs have not produced evidence of a "demonstrated probability" that the same controversy will recur.  FEC Mem. [Dkt. 27] at 15-16; *see Herron*, 903 F. Supp. 2d at 14 ("Ordinarily, courts require plaintiffs to submit evidence suggesting that their controversy is likely to recur.").  However, Plaintiffs have stated their clear intentions to continue contributing to general-election candidates who won contested primaries, and they have provided evidence of the frequency of general elections in which candidates from uncontested primaries will face winners of contested primaries.  *See* Pl. Reply at 5-6.

The cases cited by FEC are inapt.  In *Herron for Congress v. FEC*, an unsuccessful candidate for Congress sued FEC for failing to penalize his opponent for violating campaign disclosure laws, challenging a *specific* finding made by the FEC as to a *specific* opponent.  903 F. Supp. 2d 9 (D.D.C. 2012).  The district court noted that the irreversibility of elections did not make a case moot.  However, that plaintiff's case was moot because he was

only *considering* a run for office in the future, which he acknowledged was "somewhat conditional" on the court's ruling. *Id.* at 13-14. Indeed, the plaintiff had "made clear that he [would] not run for office" in the upcoming election, that he had not decided about whether he would ever run in the future, and that his decision turned in part on result of lawsuit. *Id.* at 13. In contrast, the instant Plaintiffs aver that that they will seek to contribute $5,200 to future candidates.

Nor are FEC's other cases persuasive. *Virginians Against a Corrupt Congress v. Moran* involved a challenge to mailings made by a Congressman in the 1992 general election. No. 92-5498, 1993 WL 260710 (D.C. Cir. June 29, 1993). The Circuit found the case moot in part because the election had passed, but more importantly, because the statute at issue had been repealed and the challenged conduct was not capable of repetition. In *Bois v. Marsh*, 801 F.2d 462 (D.C. Cir. 1986), the Circuit found a plaintiff's claim moot where she challenged Army grievance procedures because "the likelihood that she will re-enter active service in the Army either by re-enlisting or by being called up for active duty and the likelihood that she would again have occasion to employ the challenged procedures if she were to return. . . . is too remote to justify judicial review at this time." *Id.* at 466-67. Finally, *Murphy v. Hunt*, 455 U.S. 478 (1982), involved a prisoner's constitutional challenge to the denial of his pretrial requests for bail. The Supreme Court held that any claims about pretrial bail were moot; once the prisoner was convicted in state court, the issue was "no longer live because even a favorable decision on it would not have entitled [him] to bail." *Id.* at 481-82. Moreover, there was no reasonable expectation or demonstrated probability that the prisoner would again find himself in the same position because there was no reason to expect that all three of his convictions would be overturned and that he would again demand bail before trial. *Id.* at 482-83. None of these cases

bears any resemblance to the instant matter, where Plaintiffs have made plain their continuing

desire to contribute $5,200 to selected candidates for use in their general election contests

without "wasting" $2,600 on a primary candidate who may not advance to the general election.

*See* Pl. Mem. in Support of Mot. for Prelim. Inj. [Dkt. 6-1] at 1.

## III. ANALYSIS

### A. Judicial Review of FECA Challenges

FECA sets forth the following judicial review procedure for any challenge to the

statute's constitutionality:

> The Commission, the national committee of any political party, or
> any individual eligible to vote in any election for the office of
> President may institute such actions in the appropriate district court
> of the United States, including actions for declaratory judgment, as
> may be appropriate to construe the constitutionality of any provision
> of this Act. The district court immediately shall certify all questions
> of constitutionality of this Act to the United States court of appeals
> for the circuit involved, which shall hear the matter sitting en banc.

52 U.S.C. § 30110.

The D.C. Court of Appeals has held that 52 U.S.C. § 30110 requires a district

court to perform three functions:

> First, it must develop a record for appellate review by making
> findings of fact. Second, the district court must determine whether
> the constitutional challenges are frivolous or involve settled legal
> questions. Finally, the district court must immediately certify the
> record and all non-frivolous constitutional questions to the en banc
> court of appeals.

*Wagner*, 717 F.3d at 1009. The Supreme Court has also instructed that Section 30110 "should

be construed narrowly, in part because it creates 'a class of cases that command the immediate

attention of . . . the courts of appeals sitting en banc, displacing existing caseloads and calling

court of appeals judges away from their normal duties for expedited en banc sittings.'"

*Libertarian Nat'l Comm., Inc. v. FEC* (*LNC*), 930 F. Supp. 2d 154, 157-61 (D.D.C. 2013)

(quoting *Bread Political Action Comm. v. FEC*, 455 U.S. 577, 580 (1982)), *aff'd in part*, No. 13-

5094, 2014 WL 590973 (D.C. Cir. Feb. 7, 2014).[5]

      The mandatory phrasing of Section 30110 "should not be read to require [district

courts] automatically to certify every constitutional question to an en banc court of appeals."

*Goland v. United States*, 903 F.2d 1247, 1257 (9th Cir. 1990). Section 30110 does not "require

certification of constitutional claims that are frivolous" when they are either "insubstantial" or

"settled." *Cal. Medical Ass'n v. FEC* (*Cal. Med.*), 453 U.S. 182, 192 n.14 (1981). Challenges to

a core provision of FECA that has already been upheld are permissible only if they present an

"unanticipated variation[]" of the law—"not every sophistic twist that arguably presents a 'new'

question should be certified." *Goland*, 903 F.2d at 1257. A "district court need not certify legal

issues that have been resolved by the Supreme Court." *Khachaturian v. FEC*, 980 F.2d 330, 331

(5th Cir. 1992); *Cal. Med.*, 453 U.S at 192 n.14 (cases that warrant certification involve issues

that "are neither insubstantial nor settled"); *Goland*, 903 F.2d at 1258 ("[W]here the legal issue

has been resolved by the Supreme Court, the district court need not certify the constitutional

challenge.").

      The Ninth Circuit described the district court's role in a Section 30110 case "as

similar to that of a single judge presented with a motion to convene a three judge court to hear

constitutional challenges" that may "dismiss constitutional claims which already had been

decided." *Goland*, 903 F.2d at 1257. *Goland* further noted that such a standard may resemble

---

[5] The Supreme Court has also noted that the burden placed upon Courts of Appeals by
Section 30110 is not overwhelming. *Cal. Medical Ass'n v. FEC*, 453 U.S. 182, 192 n.13 (1981)
("To date, there have been only a handful of cases certified to the Courts of Appeals under this
procedure . . . . we do not believe that [§ 30110] poses any significant threat to the effective
functioning of the federal courts.").

the "failure to state a claim" applied under Rule 12(b)(6); it concluded that "at least where the legal issue has been resolved by the Supreme Court, the district court need not certify the constitutional challenge." *Id.* at 1257-58.  Finally, *Libertarian Nat'l Comm., Inc. v. FEC* noted that the standard for determining the nature of a claim "was recently articulated as 'somewhere between a motion to dismiss—where no factual review is appropriate—and a motion for summary judgment—where the Court must review for genuine issues of material fact.'"  930 F. Supp. 2d at 162 (quoting *Cao*, 688 F. Supp. 2d at 503), *aff'd in part*, No. 13-5094, 2014 WL 590973 (D.C. Cir. Feb. 7, 2014).

Because "[s]ome review of the facts is inherently necessary to determine if a colorable claim has been raised," any question that a court finds settled or insubstantial "is also appropriate for summary judgment." *LNC*, 930 F. Supp. 2d at 162 (citing *Cao*, 688 F. Supp. 2d at 502-03).  Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.   If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

**B. Campaign Finance Law**[6]

"The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1441 (2014). Although both are protected as First Amendment speech, the Supreme Court distinguishes between *expenditures by candidates*, which are essentially unlimited, and *limits on contributions* to a particular candidate. *See, e.g., id.* at 1444; *Buckley v. Valeo*, 424 U.S. 1, 19-21 (1976). Because "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support," limits on contributions to a candidate or a political committee entail "only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20-21. Thus, in evaluating contribution restrictions, "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* at 25 (internal citations omitted).

In *Buckley v. Valeo*, appellants challenged the constitutionality of various provisions in the 1974 amendments to FECA and related tax code provisions. *Buckley*, 424 U.S. at 6. The Supreme Court considered whether FECA's base individual contribution limit of $1,000 to any single candidate per election was an unjustifiable ceiling that burdened First Amendment freedoms. *Id.* at 24, 30. *Buckley* found generally that individual contribution limits advanced a "sufficiently important" state interest if they are appropriately designed to reduce *quid pro quo* corruption or the appearance of corruption. 424 U.S. at 28. *Buckley* upheld the

---

[6] *LNC* provides a cogent overview of the law regarding campaign finance. *LNC*, 930 F. Supp. 2d at 157-61. The Court relies on that analysis here.

$1,000 cap, stating that "Congress was surely entitled to conclude . . . that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed." *Id.* Further, the Supreme Court noted that if a court "is satisfied that some limit on contributions is necessary," then it "has no scalpel to probe" the specific level at which Congress has set the limit. *Buckley*, 424 U.S. at 30; *see also Davis*, 554 U.S. at 737 ("When contribution limits are challenged as too restrictive, we have extended a measure of deference to the judgment of the legislative body that enacted the law."); *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (Breyer, J., plurality) ("We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives. In practice, the legislature is better equipped to make such empirical judgments, as legislators have particular expertise in matters related to the costs and nature of running for office. Thus ordinarily we have deferred to the legislature's determination of such matters.") (internal quotations omitted).

The Supreme Court has consistently reaffirmed *Buckley*'s finding that "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Buckley*, 424 U.S. at 29. *See, e.g., Davis*, 554 U.S. at 737 (The "Court has previously sustained the facial constitutionality of limits on discrete and aggregate individual contributions and on coordinated party expenditures.") (citing *Buckley*, 424 U.S. at 23-35, 38, 46-47, and n.53 and *FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 437, 465 (2001)); *McCutcheon*, 134 S. Ct. at 1442 ("[W]e have previously upheld [base contribution limits] as serving the permissible objective of combatting corruption."). While contributions

play an important role in financing political campaigns, contribution limits only pose a

constitutional problem if they "deny the individual *all* ability to exercise his expressive and

associational rights by contributing to someone who will advocate for his policy preferences."

*McCutcheon*, 134 S. Ct. at 1448 (emphasis added).

After *Buckley*, *McCutcheon* held that there is "only one legitimate governmental

interest for restricting campaign finances: preventing corruption or the appearance of

corruption." *McCutcheon*, 134 S. Ct. at 1450.  Further, "'[i]ngratiation and access . . . are not

corruption" and the only permissible restrictions are those that target "quid pro quo" corruption,

*i.e.*, "a direct exchange of an official act for money." *Id.* at 1441 (citing *Citizens United v. FEC*,

558 U.S. 310, 360 (2010)).  *McCutcheon* distinguished base campaign contribution limits, which

restrict how much money an individual may contribute to a particular candidate or committee per

election, and aggregate limits, which restrict how much money an individual may contribute in

total to all candidates or committees.  *Id.* at 1442.  The Supreme Court invalidated FECA's

aggregate limits under the First Amendment because aggregate limits do not further the

legitimate interest of combatting corruption, but "seriously restrict participation in the

democratic process." *Id.*  *McCutcheon* did not involve a challenge to individual base

contribution limits and thus did not alter *Buckley*'s finding that individual base contribution

limits advance an anti-corruption interest.  *Id.* ("[W]e have previously upheld [base contribution

limits] as serving the permissible objective of combatting corruption.")

**C.  Plaintiffs' First Amendment Claim Involves Issues of Settled Law**

Plaintiffs argue that FECA's individual per-election contribution limit

unconstitutionally prohibits them from giving $5,200 to their preferred candidates in their

general elections.  They do not dispute that *Buckley* forecloses challenges to "the general

imposition of individual contribution limits."  Pl. Mem. [Dkt. 25] at 12 (citing *Buckley*, 424 U.S. at 28-29).  Rather, Plaintiffs claim their case is novel because the Supreme Court has not addressed the effect of FECA's "bifurcated" per-election campaign contribution limit, which "prevents Plaintiffs and those similarly situated from giving the full, non-corrupting contribution amount at the time they feel is most critical in the electoral cycle."  Pl. Mem. at 19.

As an initial matter, Plaintiffs' repeated description of FECA's per-election structure as "bifurcated" is factually incorrect.  FECA does not dictate a maximum contribution limit of $5,200 that may be split between the primary and general elections.  Rather, FECA sets a per-election base limit of $2,600: an individual may contribute $2,600 to one candidate for each "election," as defined, in which he participates.  *See* 52 U.S.C. § 30116(a).[7]  Donating $2,600 to a candidate for his primary-election campaign and $2,600 to that same candidate for his general-election campaign is not the same as donating $5,200 solely to his general election campaign.  Congress simply does not allow *any* contributor to give $5,200 for a general election.  Further, Plaintiffs' assertion that there is a $5,200 cap that is "bifurcated" between the primary and generally elections is a false construct.  Federal elections cycles vary from state to state, and may include runoffs, special elections, and party conventions, all of which qualify for an individual $2,600 contribution, in addition to primary and general elections.  52 U.S.C. § 30101(1).[8]

---

[7] As noted above, the per-candidate, per-election contribution limit for the 2013-2014 election cycle was $2,600; that limit since been raised to $2,700.  *See supra*, Factual Findings ¶ 10.  For purposes of clarity, this Opinion refers to a $2,600 limit.

[8] Plaintiffs' references to a "bifurcated" structure may be tied to their insistence that their case is an as-applied constitutional challenge and thus, the ostensible limit for the two elections in which Plaintiffs sought to contribute was $5,200.  But Plaintiffs' challenge is not, at base, an as-applied constitutional challenge to FECA.  *See infra* at 41 (citing *Doe v. Reed*, 561 U.S. 186, 194 (2010)).

With respect to their First Amendment claim, Plaintiffs are correct that *Buckley* upheld the dollar value of FECA's individual contribution limit and did not address the constitutionality of setting contribution limits on a per-election basis. *See Buckley*, 424 U.S. at 21-22. But Plaintiffs are mistaken that their claim raises an issue of unsettled law. By seeking to combine the permissible contribution amounts for both primary and general election in order to have flexibility to donate that aggregate amount to a general election campaign, Plaintiffs are effectively challenging Congress's decision to set a base dollar limit for individual per-election contributions to federal candidates—a decision that is contemplated and approved by *Buckley*. *Id.* at 28 ("Congress was surely entitled to conclude . . . that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions.").

Plaintiffs argue that FECA's limit is unconstitutional as-applied because they were prevented from contributing $5,200 to the 2014 general-election campaigns of their preferred candidates after they won their primary elections, unlike other contributors who allegedly could contribute $5,200 to their preferred candidates for use in the general election.[9] This claim is unsettled, according to Plaintiffs, because *Buckley* did not address *when* a contributor could give $5,200 during the election cycle, but instead upheld the base limit of $5,200 itself. Plaintiffs are wrong. The base limit is not $5,200. Congress has decided that the base limit—the maximum contribution to a candidate for his general election campaign—is $2,600, and *Buckley* mandates deference to that limit. *Id.* at 30 (If "it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $ 2,000 ceiling

---

[9] This alleged $5,200 contribution to a general election is the result of an FEC regulation, discussed below.

might not serve as well as $ 1,000."). That *Buckley* did not consider whether FECA's per-election structure violates the First Amendment does not render Plaintiffs' claim unsettled because, stripped to the bare facts of their case, Plaintiffs are seeking simply to contribute more than Congress has authorized.

Plaintiffs repeatedly maintain that individuals supporting candidates who faced little or no opposition in their primaries can allegedly contribute $5,200 to that candidate's general election campaign.[10]  However, the fact that $5,200 may be used for a candidate's general election campaign is only a consequence of an FEC regulation that permits a candidate in a general election who has unused primary contributions to transfer those primary contributions to pay for general-election expenses. *See* 11 C.F.R. § 110.3(c)(3).  Neither FECA nor any Supreme Court opinion authorizes an individual contribution of $5,200 for a general election.[11]

Plaintiffs' argument further reveals that their First Amendment claim challenges FECA's monetary restrictions.  Plaintiffs state that FECA's per-election limit "allows supporters of candidates without primary challengers to contribute twice as much money for the general election," and thus "doubles the scope of association that certain contributors enjoy."  Pl. Mem. at 32.  Plaintiffs also seek to "double the scope" of their association by increasing their own general-election contributions beyond the congressionally-mandated, judicially-approved limit. This challenge is precluded by *Buckley*'s finding that "the weighty interests served by restricting

---

[10] No contributor has control over how a candidate ultimately uses his contribution.  *See* 11 C.F.R. § 110.1(b)(6).

[11] Plaintiffs argue that their case warrants certification because 11 C.F.R. § 110.3(c)(3) "received not a single mention in the *Buckley* opinion."  Pl. Mem. at 16.  It is true that *Buckley* did not address this FEC regulation.  But Plaintiffs have not challenged the regulation in this case, *see Holmes*, 2014 WL 5316216, at *6 n.8, and it is not clear that they have standing to do so.  *See* FEC Mem. at 30.

the size of financial contributions to political candidates are sufficient to justify the limited effect

upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Id.* at 29.

Plaintiffs cite *McCutcheon* for recognizing a legal limit of $5,200 for individual

campaign contributions, *see* Pl. Mem. at 19 (citing 134 S. Ct. at 1452), not limited to $2,600 per

election.  But Plaintiffs place too much weight on *McCutcheon*'s shorthand comments,

particularly in light of *McCutcheon*'s explicit recognition of FECA's $2,600 per-election base

limit.  *McCutcheon*, 134 S. Ct at 1442.  Taken out of context, the dicta on which Plaintiffs rely—

"Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount

or less do not create a cognizable risk of corruption," *id.* at 1452,—appears to bolster their

argument.  However, Plaintiffs misread *McCutcheon* and would take its holding well beyond its

facts.  In *McCutcheon*, an individual contributed the same base limit of $2,600 to 16 different

federal candidates, and sought to contribute the base limit to an additional 12 candidates, but was

prevented from doing so by the aggregate limit on contributions to candidates.  *Id.* at 1436.  The

Supreme Court noted that for the 2013-2014 election cycle, FECA's base limits "permit an

individual to contribute up to $2,600 per election to a candidate ($5,200 total for the primary and

general elections)."  *Id.* at 1442.  In contrast, the aggregate limits "permit an individual to

contribute a total of $48,600 to federal candidates and a total of $74,600 to other political

committees."  *Id*.  While the base limits "restrict how much money a donor may contribute to

any particular candidate or committee[,] the aggregate limits have the effect of restricting how

many candidates or committees the donor may support, to the extent permitted by the base

limits."  *Id*. at 1443.  The Supreme Court found FECA's aggregate limits were unconstitutional,

stating that:

> To put it in the simplest terms, the aggregate limits prohibit an
> individual from fully contributing to the primary and general

election campaigns of ten or more candidates, even if all
contributions fall within the base limits Congress views as adequate
to protect against corruption.  The individual may give up to $5,200
each to nine candidates, but the aggregate limits constitute an
outright ban on further contributions to any other candidate.

*Id.* at 1448.[12]

In overruling the aggregate limits, however, *McCutcheon* did not alter *Buckley*'s

finding that congressionally-selected base limits on individual contributions advance an anti-

corruption interest.  Accordingly, *McCutcheon* does not stand for the proposition that a

contribution of $5,200 to a candidate's general-election campaign is non-corrupting as a matter

of law.  Rather, the Supreme Court confirmed that FECA's base individual contribution limit is

$2,600 per-election.

The Court recognizes Plaintiffs' frustration that a contributor cannot give $5,200

to a candidate for use in a general election but may give $2,600 to a candidate the day before the

primary and $2,600 the day after the primary, and that the FEC regulation allows a candidate to

transfer unused primary funds for use in the general election (if she wins the primary).  But the

fact that candidates may transfer contributions is a result of an agency regulation.  Neither

Congress nor the Supreme Court has ever authorized individual contributors to give $5,200 to

one candidate solely for use in a general election.  To the contrary, the Supreme Court has held

that FECA's individual limits on base contributions are permissible and Congress set such a

---

[12] The Supreme Court's reference to $5,200 was a product of the facts in that case, where
appellant made the maximum permissible base level contributions to his preferred candidates for
their primary and general elections, in compliance with FECA.  While an individual may give
$5,200 *overall*, it does not follow that Congress has also authorized a $5,200 contribution
directly for a candidate's general-election campaign.

limit—at $2,600.  Thus, because Plaintiffs' claim rests on settled law, certification is not warranted.[13]

### D.  Plaintiffs' Fifth Amendment Claim Involves Issues of Settled Law

Plaintiffs argue that their experience "demonstrates that favored contributors may give their preferred candidates $5,200 for the general election, while Plaintiffs and those similarly situated may not."  Pl. Mem. at 6.  They seek certification, contending that the Supreme Court has not decided whether the "asymmetry posed when a candidate who faces a primary challenge[r] competes in the general election against a candidate who ran virtually unopposed during the primary" constitutes a Fifth Amendment violation of their right to equal protection.[14] Pl. Mem. at 20.

*Buckley* addressed an argument that "the contribution limitations work such an invidious discrimination between incumbents and challengers that the statutory provisions must be declared unconstitutional on their face."  *Buckley*, 424 U.S. at 30-31.  The Supreme Court rejected the facial challenge because "the Act on its face treats all candidates equally with regard to contribution limitations."  *Id.* at 33.  It further stated that "[a]bsent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to

---

[13] Plaintiffs do not argue that *Citizens United v. FEC*, 558 U.S. 310 (2010), impacts the analysis in this case.

[14] The Fourteenth Amendment specifies that that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14, § 1.  Equal protection applies equally to the federal government through the Fifth Amendment Due Process Clause. U.S. Const. Amend. 5 ("No person . . . shall be deprived of life, liberty or property, without due process of law.").  *See, e.g., Buckley*, 424 U.S. at 93 ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 804 (D.C. Cir. 1988) ("Although the Equal Protection Clause appears only in the 14th Amendment, which applies only to the states, the Supreme Court has found its essential mandate inherent in the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government.").

invalidate legislation which on its face imposes evenhanded restrictions." *Id.* at 31. Contribution "limitations may have a significant effect on particular challengers or incumbents, but the record provides no basis for predicting that such adventitious factors will invariably and invidiously benefit incumbents as a class." *Id.* at 33. The "danger of corruption and the appearance of corruption apply with equal force to challengers and to incumbents," and thus "Congress had ample justification for imposing the same fundraising constraints upon both." *Id.*

That *Buckley* found FECA's contribution limits constitutional on their face does not mean that the statute could not be unconstitutional in an as-applied challenge. *See id.* at 31 n.33 (expressing no "opinion with regard to the alleged invidious discrimination resulting from the full sweep of the legislation as enacted"); *Doe v. Reed*, 561 U.S. 186, 201 (2010) (rejecting broad challenge to state disclosure law but noting that, as "in other election law disclosure cases," "upholding the law against a broad-based challenge does not foreclose a litigant's success in a narrower one"). Plaintiffs claim that *Buckley* does not foreclose their as-applied challenge, a characterization with which FEC disagrees. In any event, "[t]he label is not what matters." *Doe*, 561 U.S. at 194. "The important point is that plaintiffs' claim and the relief that would follow"—invalidating FECA's per-election individual contribution limit—"reach beyond the particular circumstances of these plaintiffs." *Id.* "They must therefore satisfy our standards for a facial challenge to the extent of that reach." *Id.*

As in *Buckley*, this Court finds no evidence of invidious discrimination against these Plaintiffs or any purported class of individual contributors. FECA treats all individual contributors equally by imposing uniform per-candidate, per-election contribution limits. Although Plaintiffs "may be prevented from contributing $5,200 to their chosen candidates after their primary elections, Plaintiffs [are] only restricted *to the exact same extent* as any other

individuals wishing to contribute more than $2,600 per election." *Holmes*, 2014 WL 5316216, at

*5 (emphasis in original).

> As this Court previously stated:
>
>> No individual has the power to give $5,200 solely for use in the general election.  It may be that a contributor to an unopposed incumbent will contribute $2,600 before the primary election in anticipation that it will all be used in the general election.  How the funds are actually spent, of course, is wholly out of the contributor's control.  An unopposed candidate may well decide to campaign before the primary in order to get a head start on the general election campaign—or not, depending on the candidate's calculus of her reelection chances.  In either case, contributors have not been treated differently.  Plaintiffs' argument that the law works asymmetric and discriminatory effects by favoring one category of candidates over another is therefore misplaced.  It is the candidate who faces no primary challenger—whether an incumbent or a first-time candidate—who might be advantaged by saving campaign costs for the primary.  Accordingly, even if a candidate in a primary must spend money to advertise and win, it does not follow that the rights of his contributors have been treated unequally.

*Id.* at *6.

>> [FECA] creates *identical* contribution limits for all candidates based solely the number of elections in which they run for federal office. The fact that a candidate may be fortunate enough not to face "significant opposition" in her primary does not render the statute's treatment of her contributors unconstitutional . . . . Any variance in the levels of funding is a natural result of the political process, not a result of the per-election contribution limit.

*Id.*

> Because there is simply no record evidence that the statute, which "applies the

same limitations on contributions to all candidates regardless of their present occupations,

ideological views, or party affiliations," *Buckley*, 424 U.S. at 31, works an asymmetric effect on

Plaintiffs as contributors, *Buckley*'s reasoning applies with equal force here. Certification is thus unwarranted as Plaintiffs' Fifth Amendment claim is based on settled law.[15]

Acknowledging that FECA's contribution scheme "'on its face' does not appear discriminatory," Plaintiffs argue that it works a "disparate impact in favor of contributors to candidates who do not face a primary challenge." Pl. Mem. at 29. But Plaintiffs cannot pursue an equal protection violation by arguing disparate impact when they have made no showing of purposeful discrimination. *See Lewis v. Casey*, 518 U.S. 343, 375 (1996) ("[A]bsent proof of discriminatory purpose, a law or official act does not violate the Constitution solely because it has a . . . disproportionate impact.") (internal quotation omitted); *Harris v. McRae*, 448 U.S. 297, 323 n.26 (1980) ("The equal protection component of the Fifth Amendment prohibits only purposeful discrimination, and when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.") ((internal quotations and citations omitted).[16]

---

[15] Even if Plaintiffs' claim were not foreclosed by *Buckley*, the Court finds it insubstantial and undeserving of certification. The facts here make clear that "Plaintiffs' perceived inequality in contribution limits is not imposed by FECA or its regulations, but by the vagaries of the election process," *Holmes*, 2014 WL 5316216, at *6, and therefore Plaintiffs fail to state an equal protection claim under the Fifth Amendment.

[16] As noted in this Court's denial of Plaintiff's motion for a preliminary injunction, the Supreme Court has not decided the appropriate level of scrutiny in cases challenging political contribution limits on equal protection grounds. *See Holmes*, 2014 WL 5316216, at *5 (applying same intermediate scrutiny to both First Amendment and equal protection challenges). However, this gap in Supreme Court jurisprudence does not save Plaintiffs' Fifth Amendment claims because they are insubstantial under any level of scrutiny.

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that no constitutional questions warrant certification because Plaintiffs' claims involve questions of settled law.  The Court will deny Plaintiffs' motion for certification and will grant FEC's motion for summary judgment. Judgment will be entered in favor of FEC.  A memorializing Order accompanies this Opinion.


Date: April 20, 2015

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
